# United States Court of Appeals
## For the First Circuit

No. 12-2194

MICHELLE KOSILEK,

Plaintiff, Appellee,

v.

LUIS S. SPENCER, Commissioner of the
Massachusetts Department of Correction,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Howard, Thompson and Kayatta, Circuit Judges.

Richard C. McFarland, Legal Division, Department of Correction, with whom Nancy Ankers White, Special Assistant Attorney General, was on brief for appellant.

Joseph L. Sulman, with whom David Brody, Law Office of Joseph L. Sulman, Frances S. Cohen, Jeff Goldman, Christina Chan, and Bingham McCutchen LLP, were on brief for appellee.

Andrew D. Beckwith, on brief for the Massachusetts Family Institute, amicus curiae in support of appellant.

Daniel V. McCaughey, Cori A. Lable, Kristin G. Ali and Ropes & Gray LLP, on brief for World Professional Association for Transgender Health, Mental Health America, Callen-Lorde Community Health Center, Whitman-Walker Health, GLMA: Health Professionals Advancing LGBT Equality, and Mazzoni Center, amici curiae in support of appellee.

Matthew R. Segal, Joshua Block, LGBT Project, and David C. Fathi, National Prison Project, on brief for American Civil

Liberties Union, American Civil Liberties Union of Massachusetts, Legal Aid Society, Harvard Prison Legal Assistance Project, Prisoners' Legal Services of New York, and Prisoners' Legal Services of Massachusetts, amici curiae in support of appellee.

Jennifer Levi and Bennett H. Klein, on brief for Gay & Lesbian Advocates & Defenders, EqualityMaine, Human Rights Campaign, MassEquality, Massachusetts Transgender Political Coalition, National Center for Transgender Equality, National Gay & Lesbian Task Force, and Transgender New Hampshire, amici curiae in support of appellee.

---

Opinion En Banc

---

---

December 16, 2014

---

**TORRUELLA, <u>Circuit Judge</u>.** This case involves important issues that arise under the Eighth Amendment to the U.S. Constitution. We are asked to determine whether the district court erred in concluding that the Massachusetts Department of Correction ("DOC") has violated the Cruel and Unusual Punishment Clause of the Eighth Amendment by providing allegedly inadequate medical care to prisoner Michelle Kosilek ("Kosilek"). More precisely, we are faced with the question whether the DOC's choice of a particular medical treatment is constitutionally inadequate, such that the district court acts within its power to issue an injunction requiring provision of an alternative treatment -- a treatment which would give rise to new concerns related to safety and prison security.

After carefully considering the community standard of medical care, the adequacy of the provided treatment, and the valid security concerns articulated by the DOC, we conclude that the district court erred and that the care provided to Kosilek by the DOC does not violate the Eighth Amendment. We therefore reverse the district court's grant of injunctive relief, and we remand with instructions to dismiss the case.

## I. <u>Background</u>

This litigation has now spanned more than twenty years and produced several opinions of significant length. <u>See</u> <u>Kosilek</u> v. <u>Spencer</u>, 889 F. Supp. 2d 190 (D. Mass. 2012) ("<u>Kosilek II</u>");

<u>Kosilek</u> v. <u>Maloney</u>, 221 F. Supp. 2d 156 (D. Mass. 2002) ("<u>Kosilek</u> <u>I</u>"). In light of the expansive record, we recite here only the facts necessary to clarify the issues on appeal.

## A. Michelle Kosilek

Michelle Kosilek -- born in 1949 as Robert Kosilek -- is an anatomically male prisoner in her mid-sixties who suffers from gender identity disorder ("GID")[1] and self-identifies as a female. In 1992 Kosilek was convicted of first-degree murder and sentenced to a term of life imprisonment without parole for the 1990 strangulation of her then-wife, Cheryl McCaul, whose body was found abandoned in the backseat of a vehicle at a local shopping mall. <u>See</u> <u>Commonwealth</u> v. <u>Kosilek</u>, 423 Mass. 449, 668 N.E.2d 808 (1996). While awaiting trial for McCaul's murder, Kosilek twice attempted to commit suicide. She also once tied a string around her testicles in an attempt at self-castration, but removed the string when it became painful. Since 1994, Kosilek has been housed at MCI-Norfolk, a medium security male prison in Massachusetts. Throughout the twenty-year duration of her incarceration at MCI-Norfolk, Kosilek has not attempted to harm herself.

---

[1] The term "gender identity disorder" has recently been replaced with the term "gender dysphoria" in the medical community. <u>See</u> Am. Psychiatric Ass'n, <u>Gender Dysphoria</u>, http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf (last visited June 3, 2014). To maintain consistency with prior related litigation and evidence in the record, we continue to use the term "GID" in this opinion.

## B. Kosilek I

Kosilek first sued the DOC in 1992, alleging that its failure to provide direct treatment for her GID was a violation of the Eighth Amendment. At that time, Kosilek was receiving only "supportive therapy" to cope with the distress caused by her GID. Kosilek initially sought both damages and injunctive relief requiring the DOC to provide her with sex reassignment surgery ("SRS"), although only her claim for injunctive relief survived to trial.

The district court issued a decision in 2002, in which it concluded that Kosilek had proven the existence of a serious medical need and had shown that her then-current treatment plan was inadequate. The court concluded, however, that the DOC was unaware that a failure to provide additional treatment to Kosilek might result in serious harm. Moreover, it held that the DOC's failure to provide treatment was rooted, at least in part, in "sincere security concerns." As a result, the court ruled that the DOC was not in violation of the Eighth Amendment.

Despite finding for the DOC, the district court's opinion made clear that Kosilek required additional treatment for her GID, and that the DOC would need to develop and implement an improved treatment plan. The court warned that a failure to provide treatment in the future, now that the DOC was on notice of the

potential for harm if only "supportive therapy" was provided, could amount to an Eighth Amendment violation.

**C.  The DOC offers treatment**

The DOC responded to <u>Kosilek I</u> by revamping its policy for GID treatment.  In the past, the DOC had adopted a policy of "freezing" a prisoner's treatment at whatever level that prisoner had attained prior to incarceration.  Hormonal treatment, for example, would be available only to prisoners who had been prescribed hormones prior to incarceration.  In place of this "freeze-frame" policy, after <u>Kosilek I</u> the DOC adopted a plan that allowed prisoners to receive additional treatment beyond the level of that received before entering prison, when such care was medically required.  Under this new plan, medical recommendations would be made by the University of Massachusetts Correctional Health Program ("UMass"), a health-services provider contracted by the DOC.  The DOC Commissioner and the DOC Director of Health Services were responsible for assessing whether any change in treatment would create increased security concerns.

Kosilek was evaluated by Dr. David Seil, a gender-identity specialist, who prescribed a course of treatment to alleviate the mental distress -- often referred to as "dysphoria" -- associated with her GID.  In line with Dr. Seil's recommendations, in 2003 the DOC began providing Kosilek with significant ameliorative treatment aimed at directly addressing the

mental distress caused by GID.  In addition to continued mental health treatment, she was provided female, gender-appropriate clothing and personal effects, and electrolysis was performed to permanently remove her facial hair.[2]  Kosilek also began a course of hormonal treatments recommended by an endocrinologist.  These treatments resulted in "breast development and shrinkage of her testicles."  All of the treatments described continue to be offered to Kosilek to the present day.

## D.  Consideration of SRS

In line with the Harry Benjamin Standards of Care ("the "Standards of Care" or "the Standards"),[3] Dr. Seil recommended that Kosilek be considered for SRS after one year of hormonal

---

[2]  Facial hair removal was delayed because of difficulty finding a provider that was willing to perform these services on Kosilek. The minutes of the DOC's Executive Staff Meetings show that they proactively sought out service providers throughout this period of delay, and electrolysis was completed in November 2004.

[3]  The Standards of Care are a set of treatment recommendations issued by the Harry Benjamin International Gender Dysphoria Association that provide guidance on the treatment of individuals with GID.  Relevant to Kosilek II is the sixth version of the Standards of Care.  See Harry Benjamin Int'l Gender Dysphoria Ass'n, Standards of Care for Gender Identity Disorders, Sixth Version (2001) ("Standards of Care").  A seventh version of the Standards of Care was published in 2011, and adopts the Harry Benjamin Association's new name.  See World Professional Ass'n for Transgender Health ("WPATH"), Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7 (2011).  The Standards of Care "are intended to provide flexible directions for the treatment" of GID, and state that "[i]ndividual professionals and organized programs may modify" the Standards' requirements in response to "a patient's unique . . . situation" or "an experienced professional's evolving [treatment methodology]." Standards of Care at 1-2 (emphasis added).

treatment.[4]  Accordingly, in 2004 the DOC began the process of finding an appropriate professional to evaluate Kosilek's eligibility for, and the necessity of, SRS.  At the DOC's Executive Staff Meetings there was some debate regarding who should be hired to conduct this evaluation.  The UMass Mental Health Program Director, Dr. Kenneth Appelbaum, suggested that the DOC consult with the Fenway Community Health Center (the "Fenway Center").  The Fenway Center is a Boston-based facility focused on serving the lesbian, gay, bisexual, and transgender community.  In contrast, the DOC's Director of Mental Health and Substance Abuse Services, Gregory Hughes ("Hughes"), suggested consulting with Cynthia Osborne ("Osborne"), a gender identity specialist employed at the Johns Hopkins School of Medicine who had experience working with other departments of correction regarding GID treatment.

Hughes expressed concern with using the Fenway Center because of "the perception that their approach was to come out with recommendations that globally endorsed a full panoply of treatments."  It was thought that Osborne, in contrast, "may do more objective evaluations."  Dr. Appelbaum noted, however, that the Fenway Center's approach was, to his knowledge, probably "more

---

[4]  This treatment plan aligns with the Standards of Care's triadic sequence for GID treatment.  This sequence begins with diagnosis and the provision of therapy, progresses to endocrine treatments, and culminates with consideration of SRS after at least one full year living a "real life experience" in the preferred gender role. Many individuals with GID choose not to complete the full sequence.

the norm than the exception." The DOC also recognized that having a Boston-based treatment provider might more easily facilitate the process of Kosilek's evaluation.

The Fenway Center was retained by the DOC, and Kosilek was evaluated by Kevin Kapila, M.D., and Randi Kaufman, Psy.D., in a ninety-minute interview. Drs. Kapila and Kaufman also reviewed Kosilek's medical records. On February 24, 2005, they issued a report recommending that Kosilek receive SRS (the "Fenway Report"). The Fenway Report acknowledged Kosilek's positive response to the treatment provided by the DOC.

> Her joy around being feminized through hormone therapy, facial and body hair removal, and her ability to have access, and to dress in, feminine attire and make-up is palpable. These responses further suggest that being able to express herself as female has been helpful in alleviating her gender dysphoria. . . . [I]t is clear that her increasingly feminine presentation has been beneficial to her psychologically.

Nonetheless, it also emphasized that Kosilek remained significantly distressed by "having male genitalia, as well as not having female genitalia." In light of this continuing distress, the Fenway Center doctors stated that "it is quite likely that Michelle will attempt suicide again if she is not able to change her anatomy." The report also concluded that Kosilek had fully progressed through the Standards of Care's triadic sequence, and that she "appear[ed] to be ready" for SRS. SRS, the doctors believed, would most likely "allow Michelle to have full relief from the symptoms of gender

dysphoria" and would quite possibly "increase her chance for survival" by greatly decreasing the potential for future suicidal ideation.

The Fenway Report was received by the DOC and reviewed by Dr. Appelbaum and his UMass colleague, Dr. Arthur Brewer. The UMass doctors informed the DOC that they found no clear contraindications to SRS, but noted that they were "unaware of any other case in which an inmate has undergone sex reassignment surgery while incarcerated."

After considering the information from UMass, the DOC decided to have Osborne conduct a peer review of the Fenway Report. In a letter to Osborne, the DOC stated that it was requesting her services because "[t]he treatment of Gender Identity Disorder within a correctional environment is a complicated issue and one that the Department takes very seriously. We are aware of the substantial expertise you possess in this area and hope that you can provide us with assistance in determining appropriate

treatment."[5]  On April 12, 2005, the DOC sent Osborne copies of all previous medical evaluations of Kosilek.

On April 28, 2005, the DOC Director of Health Services, Susan Martin ("Martin"), wrote UMass, stating her concern that UMass had not "address[ed] the lack of detail, clarity and specific recommendations in the evaluation done by the Fenway Clinic," and had failed to provide an independent recommendation as to the appropriateness of surgery.  She also asked for specific logistical information, including a list of doctors who might provide the surgery, what procedures would be performed, and what recovery time could be expected.

On May 10, 2005, Drs. Appelbaum and Brewer replied, indicating that they deferred to the Fenway Center's recommendation of surgery, as they were not experts in the area of SRS -- a medical procedure specifically excluded from their contract to provide services to the DOC.  They provided a preliminary list of surgeons to consider, none of whom were licensed to practice medicine in Massachusetts.

---

[5]  Osborne previously worked with the Virginia and Wisconsin Departments of Correction regarding their treatment of prisoners with GID.  It is unclear from the record whether the Fenway Center had previously developed treatment plans for GID within a penological setting.  When the DOC asked what consideration the Fenway Center gave to issues such as "criminal history [and] violence against women," the center responded that "independent of other psychological disorders [Fenway experts] don't consider criminal history, homicide, [or] brutality."  On January 5, 2005 -- before the Fenway Center released its report -- the DOC's Director of Health Services "expressed concern" about these omissions.

-11-

On May 20, 2005, Osborne finished her peer review of the Fenway Report. She began by making clear that her review was limited to reading and evaluating the reports of others. As a result, she could not independently diagnose Kosilek, but she agreed with the conclusion that Kosilek suffered from GID. Still, she disagreed with what she believed to be a lack of comprehensiveness in the report and an inclination to minimize the possibility of comorbid conditions. Namely, Osborne highlighted that Kosilek had previously been diagnosed with Antisocial Personality Disorder, a diagnosis neither confirmed nor denied by the Fenway Report, and that the report included no indication that Kosilek had been assessed for other pathologies likely to lead to self-harming behavior. Osborne expressed belief that threats of self-harm or suicide should serve as a contraindication to surgery, and that such threats were not a valid or clinically acceptable justification for surgery. In consequence, she disagreed with the Fenway Center's statements that surgery was medically necessary as a means to diminish the likelihood that Kosilek would attempt suicide in the future.

Osborne's report also highlighted that the Standards of Care admit of flexible application, and noted that the Standards state that "the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad." She emphasized that "[t]here is currently no

-12-

universal professional consensus regarding what constitutes medical necessity in GID."

In reference to the Standards of Care's application in a penological setting, Osborne noted that the Standards of Care include a criterion that candidates for SRS exhibit "satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality." She believed that this requirement was inherently in conflict with the Standard's application to incarcerated persons, as she felt incarceration indicated a lack of mastery over such antisocial leanings. Moreover, Osborne noted that non-incarcerated individuals often face external constraints in their choice of treatments or determine, as a result of their "real life experience," that other, non-invasive treatments are personally preferable to SRS. In consequence, she felt that it was unrealistic for inmates to expect "that prison life [would] provide no constraints or obstacles to cross gender preferences" and that it was "outside[] the bounds of good clinical practice" for care providers to try to meet this expectation. Given the isolation attendant to incarceration, Osborne also emphasized that prisoners might often lack awareness of the frequency with which individuals choose alternative treatments over SRS.

After considering Osborne's peer review, Martin again reached out to the doctors at UMass. On May 25, 2005, she expressed continuing concern with the Fenway Report, highlighting

that Osborne's peer review had raised at least three questions regarding the report's thoroughness: (1) why the report omitted consideration of potential comorbidities; (2) why the report did not rely on formal psychological testing, but only an in-person interview; and (3) why Kosilek's claims that she would likely seek to end her life if not provided with SRS were seen to justify, rather than serve as a contraindication to, surgery. Martin also expressed dissatisfaction that "the February 24, 2005 evaluation by the Fenway Clinic does not indicate whether sex reassignment surgery is a medical necessity for Michele [sic] Kosilek" and "fails to adequately address the issue of whether the current treatment provided to Kosilek provides sufficient relief of the symptoms of gender dysphoria."

A response from Drs. Appelbaum and Brewer came on June 14, 2005. The doctors made clear that they were not experts in the treatment of GID, and that they deferred to the Fenway Center's treatment recommendation. Referring to the differences between the preferred treatment plans of the Fenway Center and Osborne, the doctors reminded Martin that Osborne's report had emphasized the "dearth of empirical research upon which to base treatment decisions" for GID and had highlighted the lack of "professional consensus" regarding the "medical necessity" of SRS.

The Fenway Center issued a follow-up report aimed at answering Osborne's critique of its initial recommendation. In

this report, Drs. Kapila and Kaufmann noted that suicidal ideation was common among individuals suffering from GID, and that it often decreased with the provision of care. Therefore, the likelihood that Kosilek would become suicidal if denied surgery was, to the doctors, not a contraindication to her eligibility, but instead was a symptom that could be alleviated by provision of SRS. The doctors also disagreed with Osborne's belief that incarceration was a significant contraindication to surgery, noting that the Standards of Care specifically state that "[p]ersons who are receiving treatment for [GID] should continue to receive appropriate treatment . . . after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment . . . ."

The Fenway Center doctors further discussed their belief that a key step of the triadic sequence, the "real-life experience," could occur in prison. This treatment prerequisite requires that an individual live full-time in their preferred cross-gender role for at least one year prior to being deemed eligible for SRS. The purpose of this requirement is ensure that GID patients have an opportunity to experience a full measure of life in a cross-gender role, including the social scrutiny that may arise among professional counterparts and peers. Prison, the Fenway Center's doctors surmised, might be considered a "more

-15-

stringent" real-life experience, because a prisoner's gender presentation would be subject to full-time monitoring by prison personnel and other inmates. The report concluded by reiterating the Fenway Center's recommendation that Kosilek receive SRS. The doctors recognized that performing "such a procedure would . . . bring up issues of housing and safety," but emphasized that "hormone therapy and [SRS] are the only clinical treatments found to be effective for GID."

## E.  The DOC's Security Report

On April 25, 2005, the district court issued an order requiring that the DOC conduct a review of any potential safety and security concerns arising from the provision of SRS. In the next month, the DOC worked to formalize its security concerns into a report, which it eventually submitted to the court on June 10, 2005. As made clear by the minutes of the DOC's staff meetings, however, these security issues were a topic of discussion prior to the court's order. Previously, on January 5, 2005, the meeting attendees had discussed how and if Kosilek's prior violent acts against her wife should impact their evaluation and treatment plan. On April 20, 2005, the parties discussed potential security concerns that would arise should Kosilek be housed, post-surgery, in MCI-Framingham, Massachusetts' only female prison. During that meeting, DOC personnel noted that they were prepared to provide an

evaluation of general climate and security concerns implicated by the provision of surgery.

On May 19, 2005, DOC Commissioner Kathleen Dennehy ("Dennehy") convened a meeting with the Superintendent of MCI-Norfolk, Luis Spencer ("Spencer"), and the Superintendent of MCI-Framingham, Lynne Bissonnette ("Bissonnette"), as well as the DOC's legal counsel. The purpose of this meeting was to formally discuss the security concerns previously expressed by both superintendents in phone conversations with Dennehy. It was also an opportunity to begin preparation of the report requested by the district court.

The report focused mainly on issues of safety and security surrounding Kosilek's post-operative housing. Dennehy conveyed concern regarding housing Kosilek at MCI-Norfolk, noting that approximately twenty-five percent of male offenders in the Massachusetts prison system are classified as sex offenders and concluding that "Kosilek would clearly be a target for assault and victimization in a male prison." The report also expressed concerns with housing Kosilek at MCI-Framingham, including the absence of single-bed cells, such that all inmates had to share cells, and the possibility that Kosilek's presence might exacerbate mental distress among the significant portion of MCI-Framingham's population that had previously experienced domestic abuse and trauma at the hands of male partners.

Given the stated infeasibility of housing Kosilek in the general population of either MCI-Framingham or MCI-Norfolk, the report considered segregated housing in a protected ward. It expressed concern, however, about the possible deleterious impact on Kosilek's mental health caused by any housing solution that required long-term isolation. The report also noted that it was not within the DOC's ability to create a special ward for prisoners with GID, given that these prisoners present a significant range of criminal histories, security ratings, and treatment needs that are antithetical to co-housing.

On June 10, 2005, citing both its internal review of safety and security and Osborne's reported concerns regarding the appropriateness of SRS, the DOC informed the district court that it had chosen to continue Kosilek's current ameliorative treatment, but not to provide her with SRS.

## F.  Kosilek II

Trial commenced on May 30, 2006, with what would be the first of three rounds of testimony. For the sake of clarity and concision, we summarize this testimony topically, rather than temporally. We begin with evidence regarding the standard of care for treatment of GID.

### 1. Testimony related to medical necessity

#### a. Initial testimony

First to testify in 2006 was an expert witness for Kosilek, Dr. George Brown, who had previously evaluated Kosilek in 2001 and was an author of the Standards of Care. Prior to testifying, Dr. Brown issued a written report assessing Kosilek's readiness for surgery and evaluating her current mental and physical presentation, as compared with 2001. Dr. Brown noted that Kosilek consistently presented as female and that "[a]ccess to makeup and female undergarments, laser hair removal, along with hormonal treatments . . . have all seemed to significantly reinforce and consolidate the outward expression of [Kosilek's] gender identity as female." Other positive effects of treatment were also described:

> Hormonal treatments have resulted in obvious breast growth since my last assessment, decrease in upper body strength, increase in hip size, changes in amount and texture of body hair, skin texture changes, testicular volume decrease, and a large reduction in spontaneous erections . . . . Psychologically, the effects of these combined treatments have [included] . . . resolution of depression, resolution of suicidality and suicide gestures and attempts, improved mood with reduction in irritability, anxiety, and depression . . . .

Based on his observations, Dr. Brown concluded that Kosilek was eligible for SRS, having met all of the readiness criteria.

Before the court, Dr. Brown's testimony emphasized that the provision of female clothing and effects, hair removal, and hormones had resulted in a lessening of "the severity of [Kosilek's] dysphoria." According to Dr. Brown "[s]he was clearly less depressed, less anxious, less irritable . . . . She was not suicidal . . . ." Despite these significant improvements, Dr. Brown testified that he believed SRS to be an appropriate and "medical[ly] necessary component" of Kosilek's treatment. He related instances in which incarcerated persons who could not complete the triadic sequence[6] exhibited an increase in negative symptoms, including a resurgence of self-harming behavior.

Dr. Brown further testified that, if not granted surgery, he believed Kosilek's feelings of "hopelessness will intensify," and that she would likely attempt suicide. In reaching this conclusion, Dr. Brown emphasized that "other parts of the treatment plan [e.g., hormones, hair removal, and the provision of female clothing] . . . all contribute in their own way to a level of improvement." Nonetheless, he felt that, if Kosilek lost hope of receiving SRS, her current treatment plan would not stop a deterioration of her mental state and the possible reemergence of suicidal ideation.

---

[6] The steps of this sequence, if fully completed, progress from GID diagnosis and therapeutic treatment, through endocrine treatment, and culminate -- after at least a one-year-long real-life experience -- with the consideration of SRS.

-20-

Dr. Kaufman from the Fenway Center also testified, reiterating that the Fenway Center believed SRS to be an appropriate and medically necessary step in Kosilek's treatment. She further stated her belief that, if not given surgery, Kosilek would present a significant risk of suicide: "if she's not able to have surgery, I think that she'll be hopeless and feel helpless and at that point really will have nothing else to live for."

Next to testify was Mark Burrows ("Burrows"), who had been Kosilek's treating psychiatrist for approximately five years. Burrows testified to Kosilek's strong desire for SRS, and to her feelings of hope associated with completing the formalization of her gender presentation. Burrows also stated that denying surgery would likely have a negative impact on Kosilek's mental health. He believed that it was "slightly" "more probable than not" that a denial of the surgery would result in Kosilek attempting to commit suicide. Burrows also spoke about his belief that, if given SRS, Kosilek should not continue to reside at MCI-Norfolk, as "the risks involved in her possibly being assaulted are obvious."

Dr. Appelbaum of UMass was also called as a witness for Kosilek. He testified as to UMass's trust in the Fenway Center's recommendations, and to his belief that the DOC need not have sought out a peer review of the Fenway Report, given the Fenway Center's expertise in the treatment of GID.

Kosilek testified next. She expressed the depth of her desire for SRS, and she stated that she would continue to experience mental anguish regarding her gender identity so long as she had male genitalia. If not provided with SRS, Kosilek said that she "would not want to continue existing [as an anatomical male]" and might instead attempt to commit suicide. She disagreed with the suggestion that treatment short of SRS could adequately relieve her mental distress, stating that "[t]he problem is my genitals. That's what needs to be fixed." Kosilek also testified as to feeling discomfort in the all-male environment of MCI-Norfolk and having a strong desire to be transferred to MCI-Framingham. She felt that the inmates at MCI-Framingham would be more accepting and welcoming of her than those at MCI-Norfolk.

The DOC offered testimony from Dr. Chester Schmidt, a licensed psychiatrist and Associate Director of the Johns Hopkins School of Medicine. Dr. Schmidt expressed his belief that Kosilek had undergone an "excellent adaptation" through treatment with hormones, hair removal, psychotherapy, and the provision of female garb. These treatments had alleviated the severity of her mental distress and allowed Kosilek to significantly consolidate her gender identity. Dr. Schmidt acknowledged that, if not provided SRS, Kosilek's level of mental distress would likely increase, with depression or attempts at self-harm possible. On the whole, however, he believed that her positive adaptation and the

consolidation of her gender identity indicated that the current course of treatment provided by the DOC was medically adequate. Dr. Schmidt explained that the severity of dysphoria associated with GID may "wax and wane," with patients feeling depressed or hopeless at times, but generally being able to alleviate these depressive symptoms with appropriate psychotherapy and medical interventions. He felt that these measures, in combination with Kosilek's current course of treatment, would allow her to live safely and maintain a level of contentment.

On cross-examination, Dr. Schmidt was questioned regarding his alleged rejection of the Standards of Care. Dr. Schmidt responded that he found the Standards of Care "very useful for patients" and that he commonly requested that patients familiarize themselves with these Standards when they began to seek care for SRS. Asked if he had stricter requirements for SRS eligibility than those in the Standards of Care, Dr. Schmidt emphasized that he neither "advocate[s] for nor . . . speak[s] against the decisions for the cross-gender hormones or eventually for surgery." Rather, he believes such decisions are best made by the patient, based on their personal needs and desires. In line with this belief, Dr. Schmidt stated that he does not specifically recommend SRS, but at a patient's request he will release medical files and send a letter indicating that a patient is ready for surgery to their chosen SRS provider.

-23-

Dr. Schmidt further testified that he viewed the Standards of Care as "guidelines." He explained, however, that "[t]here are many people in the country who disagree with those standards who are involved in the [GID] field." Because of this disagreement, Dr. Schmidt expressed hesitation to refer to the Standards of Care, or the recommendation for SRS, as medically necessary. He emphasized the existence of alternative methods and treatment plans accepted within the medical community. He also questioned whether the Standards of Care's requirement of a real-life experience could occur in prison, opining that the real-life experience required a range of social and vocational experiences unavailable within a penological setting.

Osborne testified next, reiterating her agreement with Kosilek's GID diagnosis, but disagreeing that SRS was a medically necessary treatment. In reference to the Standards of Care, Osborne testified that she fully agreed that SRS was an effective and appropriate treatment for GID. She emphasized, however, that she did not view SRS as medically necessary in light of "the whole continuum from noninvasive to invasive" treatment options available to individuals with GID. Regarding Kosilek personally, Osborne indicated that she believed Kosilek's current treatment plan had been highly effective in allowing Kosilek to feel "hopeful, euphoric, and not depressed" about her gender identity. Osborne, like Dr. Schmidt before her, again expressed skepticism as to

whether a real-life experience could occur in jail, given that a single-sex environment necessarily limited the sorts of social and human interactions available. Osborne agreed that not providing Kosilek with SRS might give rise to possible suicidal ideation, but noted that the DOC had significant expertise in treating prisoners exhibiting self-harming behavior. She felt that Kosilek's current treatment plan, in conjunction with protective measures aimed at ensuring her personal safety, was an appropriate and medically acceptable response to Kosilek's GID.

### b. The UMass report

Following the close of initial testimony, the district court ordered UMass to review the testimony of all medical experts and to issue a report regarding whether the treatment proposed by Dr. Schmidt was an adequate method of treating Kosilek's GID. In this report -- submitted to the court on September 18, 2006 -- Drs. Appelbaum and Brewer made clear that they "worked with and relied upon Dr. Kapila and Dr. Kaufman" who "assist[ed] to prepare this response." The report stated that the UMass doctors "have been informed by Dr. Kaufman and Dr. Kapila that . . . trial testimony . . . confirms their opinion that Michelle Kosilek has a 'serious medical need' because there is a 'substantial risk of serious harm if it is not adequately treated.'" In conclusion, the report reiterated that the Fenway Center believed Dr. Schmidt's proposed

treatment plan would not provide adequate care, and UMass endorsed that conclusion.

### c. The court-appointed expert

At the conclusion of the first round of testimony, the district court decided to appoint an independent expert to assist in determining what constituted the medical standard of treatment for GID. On October 31, 2006, with the parties' input, the district court selected Dr. Stephen Levine, a practitioner at the Center for Marital and Sexual Health in Ohio and a clinical professor of psychiatry at Case Western Reserve University School of Medicine. Dr. Levine had helped to author the fifth version of the Standards of Care, and served as Chairman of the Harry Benjamin International Gender Dysphoria Association's Standards of Care Committee.

A month after his appointment, Dr. Levine issued a written report. The report began by explaining the dual roles that WPATH -- formerly the Harry Benjamin Association and the organization that wrote the Standards of Care -- plays in its provision of care to individuals with GID:

> WPATH is supportive to those who want sex reassignment surgery (SRS). . . . Skepticism and strong alternate views are not well tolerated. Such views have been known to be greeted with antipathy from the large numbers of nonprofessional adults who attend each [of] the organization's biennial meetings. . . .
>
> The [Standards of Care are] the product of an enormous effort to be balanced, but it

-26-

is not a politically neutral document. WPATH aspires to be both a scientific organization and an advocacy group for the transgendered. These aspirations sometimes conflict. The limitations of the [Standards of Care], however, are not primarily political. They are caused by the lack of rigorous research in the field.

Dr. Levine further emphasized that "large gaps" exist in the medical community's knowledge regarding the long-term effects of SRS and other GID treatments in relation to its positive or negative correlation to suicidal ideation.

Dr. Levine next discussed the possibility of Kosilek having a real-life experience in prison. He explained that the Fenway Center, in stating that a real-life experience could be had in prison, "failed to offer a mild caveat that the real life test was designed to test the patients' capacity to function as a female in the community by mastering the demands of . . . family, social relationships, educational accomplishment, [and] vocational performance." Such experiences and relationships, Dr. Levine noted, are not a part of Kosilek's daily life in prison. Dr. Levine's final conclusion was that:

Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in GID, is within prudent professional community standards. Treatment stopping short of SRS would be considered adequate by many psychiatrists, gender team members, and gender patients themselves, if Kosilek were a citizen in the community. . . . [T]here are a number of acceptable community standards which derive from differing assumptions about disorders,

their causes, and the possible effective interventions.

He recognized that the different treatment plans advocated by Dr. Schmidt and the Fenway Center "each . . . [had] merit," as well as limitations. Dr. Levine further wrote that doctors generally "do not recommend treatment to GID patients. . . . The decision is [the patient's], when and if they still want it."

Dr. Levine testified on December 16, 2006. He first reiterated his belief that Dr. Schmidt's view, although not preferred by some GID specialists, was within "prudent professional standards." He noted that Kosilek had received significant relief on her current treatment plan, and that many patients with GID live comfortably without completing the triadic sequence. He believed that Kosilek had already successfully consolidated her gender identity, such that the removal of her male genitalia might relieve dysphoria, but it was not necessary to complete that consolidation. He also indicated variability and difficulty in forecasting depressive symptoms and self-harming behavior in GID patients. He explained that he believed Kosilek would certainly express deep disappointment if denied SRS -- described as the sole current focus of her life -- but that coping mechanisms might well change her outlook in months and years to come, allowing her to live happily without the provision of SRS.

The district court then asked Dr. Levine to narrow the lens of his inquiry by presuming that there were absolutely no

external contraindications to surgery and that Kosilek had indeed had a real-life experience in prison. Given these presumptions, the court asked Dr. Levine to testify as to whether it would still be prudent to not provide Kosilek with SRS. Dr. Levine acknowledged his belief that prudent professionals would generally not deny surgery to a fully eligible individual. Still, he hesitated to declare Dr. Schmidt's approach medically unacceptable. He answered that the provision of SRS would surely be a prudent course of treatment, but then stated that "I also believe it's prudent not to give her Sex Reassignment Surgery for lots of reasons." He again emphasized for the court that the treatment of GID was an evolving field, in which practitioners could reasonably differ in their preferred treatment methods. Dr. Levine explained that in many instances patients cannot or do not want to receive SRS, and prudent physicians commonly employ a range of treatments to ameliorate these patients' dysphoria.

### d.   Additional rounds of testimony

Several witnesses were recalled for additional testimony. Drs. Kapila and Kaufman appeared again on behalf of Kosilek. Both reiterated their belief that Kosilek had a serious medical need and that, given Kosilek's high risk of suicide if denied the surgery, SRS was the only adequate treatment plan. Dr. Appelbaum also testified again, as did the UMass Medical Director. Both UMass

-29-

doctors reaffirmed their endorsement of the Fenway Center's treatment recommendations.

Kosilek also presented additional witness testimony from Dr. Marshall Forstein, Associate Professor of Psychiatry at Harvard Medical School, who had previously evaluated Kosilek during Kosilek I. Dr. Forstein issued a written report, in which he noted that "the question of the most prudent form of treatment is complicated by the diagnosis of GID being on the margins of typical medical practice." Despite this recognition, he testified that he believed SRS was necessary for Kosilek. He felt that, if she was not given SRS, there was a significant risk that Kosilek would attempt suicide or self-mutilation. Although Dr. Forstein believed that psychotherapy might "help with frustration, with harassment, and with depression," he was uncertain whether Kosilek could ever fully "reconcile with being incompletely transitioned."

### 2. Testimony regarding safety and security concerns

#### a. Initial testimony

In line with the June 10, 2005, security report prepared by Commissioner Dennehy, multiple DOC officials testified regarding the safety and security concerns that were likely to arise if Kosilek was provided SRS.

First to testify was Spencer, who at that time served as Superintendent of MCI-Norfolk. Spencer began by explaining the general layout and security measures at MCI-Norfolk. He also

explained that the prison had, so far, successfully been able to accommodate Kosilek's receipt of care without incident. Spencer was unaware of any issues or incidents of harassment related to Kosilek's breast growth and increasingly feminine appearance. He stated, however, that he would have significant concerns housing an anatomically female prisoner in MCI-Norfolk, an all-male prison. Despite the lack of historical incidents specific to Kosilek, he emphasized that "inmates do get assaulted, inmates have been raped . . . [a]nd putting a female in a correctional environment like MCI-Norfolk would be of high concern to me." If Kosilek remained at MCI-Norfolk, Spencer testified that he believed she would only be safe if housed in the Special Management Unit, a highly restricted secure building separated from the general population.

Bissonnette, Superintendent of MCI-Framingham, also testified about the security concerns she believed would arise if Kosilek was transferred to the all-female prison after receiving SRS. She explained that MCI-Framingham does not have private cells, save for the segregation and medical units. All women in the general population are required to cohabitate, and that prison would be unable to provide a single-occupancy cell for Kosilek. She also explained that Kosilek's presence could create significant disruption in MCI-Framingham's population, given that Kosilek had been convicted for violently murdering her wife, and that a

significant portion of women at MCI-Framingham were victims of domestic abuse.

Bissonnette acknowledged that there were procedures in place designed to help women cope with exposure to upsetting or traumatic experiences with other prisoners, but maintained that these security concerns would require that Kosilek, if transferred to MCI-Framingham, be housed in the segregated Close Custody unit. Bissonnette explained that she had significant hesitation about incarcerating anyone long-term in the Close Custody unit, given the potential negative effects of such long-term segregation.

Commissioner Dennehy also testified. She described the security concerns arising from cross-gender housing as "obvious" to any experienced corrections officer. In line with her belief that the safety and security concerns about post-operative housing were clear, Dennehy stated that she would not feel comfortable allowing SRS -- even if mandated by the court -- if she could not identify an adequate method of safely housing Kosilek after her operation. Dennehy reiterated Spencer's and Bissonnette's concerns, stating that she deeply trusted both Superintendents' professional judgments regarding the security of housing Kosilek at their respective facilities. Dennehy also explained why reliance on an interstate compact to transfer Kosilek would be problematic. She emphasized that other states take prisoners on a fully voluntary

-32-

basis, and that no state may be willing or able to accommodate a transfer request for Kosilek.

Commissioner Dennehy was also questioned about negative press surrounding the DOC's possible provision of SRS to Kosilek. Specifically, she was asked about her professional relationship with a state senator who had vocally opposed surgery and sponsored legislation to deny its provision. She was also asked about any contact with the then-lieutenant governor, who was another strong opponent of providing SRS to prisoners. Dennehy stated that she was aware of negative press reports and political opposition surrounding Kosilek's request, but that her decision not to provide SRS was based only on security concerns and had not been influenced by this public pressure.

The district court recalled Dennehy on October 18, 2006, to ask additional questions regarding a growing amount of press coverage surrounding the case. Dennehy acknowledged that she was aware of significant news coverage of Kosilek's case, but denied personally following the story in the media. She explained that there were staff members within the DOC trained to deal with press inquiries and that she generally received only summaries of news coverage from her staff. Again, Dennehy strongly denied forming any opinion about correctional safety procedures based on media reports or public opinion.

## b. Commissioner Clarke

Dennehy ended her tenure as DOC Commissioner on April 30, 2007, and in November 2007 the position was filled by Harold Clarke. After Clarke took over, the district court requested that he familiarize himself with a selected number of trial transcripts. Clarke was ordered to file a report, on the basis of those transcripts, indicating whether he believed that the DOC had legitimate reasons to refuse Kosilek's request for SRS.

Clarke's report, filed approximately a month after the district court's order, stated that his conclusions were based on more than three decades of correctional experience and were not influenced by political or media pressure. He expressed concern regarding threats of suicide being used as a means for prisoners to receive wanted benefits or concessions from staff. Finding it to be bad practice for prison administrators to give in to demands accompanied by the threat of suicide, Clarke stated that he believed the Massachusetts prison system had taken significant measures to ensure it was prepared to deal with suicidal ideation among its prison population. In addition to considering the issue of suicide, Clarke's report reemphasized the significant post-operative security concerns expressed by his predecessor. He stated that housing Kosilek at MCI-Norfolk created clear security concerns related to mixed-gender prison populations, while housing Kosilek at MCI-Framingham would pose a significant risk of

destabilizing that environment, given the number of women prisoners who were victims of domestic violence. Clarke also stated his belief that a separate unit to house GID prisoners was not feasible, given that prisoners with GID might have a wide range of security classifications and security needs, making cohabitation unsafe. In reference to the possibility of an interstate transfer, Clarke reiterated the concern that any interstate transfer would be completely voluntary and that a receiving state might later decide to return Kosilek, at which time the housing concerns would reemerge.

Testifying before the court, Clarke acknowledged that he had received several letters from outraged state politicians claiming that provision of the surgery would be an "affront to the taxpayers" and citing state budget concerns as a reason to deny Kosilek surgery. The letters argued that a strained state budget should not be used to accommodate what the legislators believed to be an "elective" procedure and that the DOC would be "unwise" to provide it. Clarke, however, explained that he had not answered these letters, as he believed providing an answer would be inappropriate given his role as DOC Commissioner. He also denied being in any way influenced by cost concerns in reaching his conclusion regarding safety and security concerns. Clarke similarly testified that he was aware of media coverage regarding Kosilek's

request, but he had not personally viewed the news or heard the radio stories.

## G. Kosilek II

The district court issued an extensive opinion on September 4, 2012.  This opinion concluded that Kosilek had a serious medical need and that -- based on the court's belief that Dr. Schmidt was not a prudent professional -- the only adequate way to treat this need was through SRS.  Moreover, the court determined that the DOC's stated security concerns were merely pretextual and concluded that the DOC had in fact made its decision based on public and political pressure.  This, the court concluded, amounted to deliberate indifference under the Eighth Amendment.  Stating its belief that the DOC would continue to deny Kosilek adequate treatment in the future, the district court granted an injunction requiring that the DOC provide Kosilek with SRS.

## II.  Discussion

### A.  The Eighth Amendment and Medical Care in Prison

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  From this brief amendment, courts have derived the principles that govern the permissible conditions under which prisoners are held and that establish the medical treatment those prisoners must be afforded.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Where "society takes from prisoners the means to

provide for their own needs," the failure to provide such care "may actually produce physical torture or a lingering death." Brown v. Plata, 131 S. Ct. 1910, 1928 (2011) (internal quotation marks omitted). Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 103 (1976). The Eighth Amendment is meant to prohibit "unnecessary and wanton infliction of pain," which is "repugnant to the conscience of mankind." Id. at 105-06 (internal quotation marks omitted).

The Amendment's focus on punishment means that not all shortages or failures in care exhibit the intent and harmfulness required to fall within its ambit. See Farmer, 511 U.S. at 837 (reasoning that the Eighth Amendment's prohibition of punishment implies an act done with intentionality). Therefore, to prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need. See Estelle, 429 U.S. at 106 (holding that inadequate treatment must be "sufficiently harmful to evidence deliberate indifference to serious medical needs"); Sires v. Berman, 834 F.2d 9, 12 (1st Cir. 1987) ("A plaintiff must satisfy two elements to present a viable [Eighth Amendment] claim: he must show a serious medical need, and he must prove the defendant's purposeful indifference thereto.").

-37-

First, a medical need must be "serious." Id. This objective prong requires that the need be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). This prong does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing. See United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (stating that prison administrators are "by no means required to tailor a perfect plan for every inmate; while [they are] constitutionally obligated to provide medical services to inmates, these services need only be on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards" (internal quotation marks and citations omitted)); United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987) (same); Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980) ("[A]llegations [that] simply reflect a disagreement on the appropriate course of treatment . . . fall[] short of alleging a constitutional violation."). Rather, the Constitution proscribes care that is "'so inadequate as to shock the conscience.'" Torraco v. Maloney,

923 F.2d 231, 235 (1st Cir. 1991) (quoting Sires, 834 F.2d at 13)).[7]

Second, even if medical care is so inadequate as to satisfy the objective prong, the Eighth Amendment is not violated unless prison administrators also exhibit deliberate indifference to the prisoner's needs.  Estelle, 429 U.S. at 105-06.  For purposes of this subjective prong, deliberate indifference "defines a narrow band of conduct," Feeney v. Corr. Med. Servs. Inc., 464 F.3d 158, 162  (1st Cir. 2006), and requires evidence that the failure in treatment was purposeful.  See Estelle, 429 U.S. at 105 (holding that "an inadvertent failure to provide adequate medical care" is not a constitutional violation);[8] id. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to

_____

[7] Although these cases address the second, subjective prong of the Eighth Amendment analysis, we have recognized that "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination" and that "similar evidence . . . may be relevant to both components."  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 498 (1st Cir. 2011) (internal quotation marks and brackets omitted); see also DesRosiers v. Moran, 949 F.2d 15, 18-19 (1st Cir. 1991).  As the adequacy of care is germane both to Kosilek's objective need for surgery and to the DOC's alleged deliberate indifference to that need, the principles of these cases are relevant to both steps of our analysis.

[8]  Although this case does not involve "an inadvertent failure to provide adequate medical care," see Estelle, 429 U.S. at 106, that fact alone does not elevate the DOC's choice among alternative treatments to "deliberate indifference" for purposes of the Eighth Amendment analysis.

-39-

create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment."). "The obvious case would be a denial of needed medical treatment in order to punish the inmate." Watson, 984 F.2d at 540. While deliberate indifference may also be exhibited by a "wanton disregard" to a prisoner's needs, Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011), such disregard must be akin to criminal recklessness, requiring consciousness of "'impending harm, easily preventable.'" Watson, 984 F.2d at 540.

When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight. Battista, 645 F.3d at 454 ("[S]ecurity considerations also matter at prisons . . . and administrators have to balance conflicting demands."). "[W]ide-ranging deference" is accorded to prison administrators "in the adoption and execution of policies and practices that in their judgement are needed to . . . maintain institutional security." Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)) (internal quotation marks omitted). In consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety

and institutional security. <u>Cameron</u> v. <u>Tomes</u>, 990 F.2d 14, 20 (1st Cir. 1993) (requiring courts to "embrace security and administration, . . . not merely medical judgments" in assessing claims of deliberate indifference); <u>Sires</u>, 834 F.2d at 13 ("[S]afety factors are properly included in the evaluation of the medical needs of an inmate."). Importantly, prison administrators need only have "'responded reasonably to the risk.'" <u>Giroux</u> v. <u>Somerset Cnty.</u>, 178 F.3d 28, 33 (1st Cir. 1999) (quoting <u>Farmer</u>, 511 U.S. at 844).

## B.  Standard of Review

The test for establishing an Eighth Amendment claim of inadequate medical care encompasses a multitude of questions that present elements both factual and legal.  Review of such "mixed questions" is of a variable exactitude; the more law-based a question, the less deferentially we assess the district court's conclusion.  <u>In Re Extradition of Howard</u>, 996 F.2d 1320, 1328 (1st Cir. 1993) ("The standard of review applicable to mixed questions usually depends upon where they fall along the degree-of-deference continuum . . . .").

The ultimate legal conclusion of whether prison administrators have violated the Eighth Amendment is reviewed <u>de novo</u>.  <u>See</u>, <u>e.g.</u>, <u>Thomas</u> v. <u>Bryant</u>, 614 F.3d 1288, 1307 (11th Cir. 2010) ("Whether the record demonstrates that [the prisoner] was sprayed with chemical agents . . . and that he suffered

psychological injuries from such sprayings are questions of fact. Whether these deprivations are objectively 'sufficiently serious' to satisfy the objective prong, is a question of law . . . ." (internal citations omitted)); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("The district court's factual findings regarding conditions at the Prison are reviewed for clear error.  However, its conclusion that the facts do not demonstrate an Eighth Amendment violation is a question of law that we review de novo." (citing Campbell v. Wood, 18 F.3d 662, 681 (9th Cir. 1994) (en banc))); Hickey v. Reeder, 12 F.3d 754, 756 (8th Cir. 1993) ("Whether conduct, if done with the required culpability, is sufficiently harmful to establish an Eighth Amendment violation is an objective or legal determination which we decide de novo."); Alberti v. Klevenhagen, 790 F.2d 1220, 1225 (5th Cir. 1986) ("[O]nce the facts are established, the issue of whether these facts constitute a violation of constitutional rights is a question of law that may be assayed anew upon appeal.").  Subsidiary legal questions, such as whether an actor's conduct amounted to deliberate indifference for purposes of the Eighth Amendment, are likewise reviewed de novo.  Cf. Ornelas v. United States, 517 U.S. 690, 699 (1996) (holding that, for Fourth Amendment purposes, reasonable suspicion and probable cause determinations should receive de novo appellate review); United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011) (we review de novo a district court's

subsidiary reasonable suspicion and probable cause determinations in evaluating a motion to suppress); United States v. Bucci, 582 F.3d 108, 115-17 (1st Cir. 2009).

Our court awards deference to the district court's resolution of questions of pure fact and issues of credibility. See, e.g., DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991) (reviewing factual findings regarding the adequacy of care deferentially); Torraco, 923 F.2d at 234 (finding that issues of culpability in a deliberate indifference inquiry are usually questions for a jury). We will reverse the district court's findings on such factual questions only for clear error. DesRosiers, 949 F.2d at 19 ("[W]e assay findings of fact in a bench trial only for clear error."). We find clear error when we are left with "'a strong, unyielding belief, based on the whole of the record,' that the judge made a mistake." In re O'Donnell, 728 F.3d 41, 45 (1st Cir. 2013) (quoting Islamic Inv. Co. of the Gulf (Bah.) Ltd. v. Harper (In re Grand Jury Investigation), 545 F.3d 21, 24 (1st Cir. 2008)). We may also find clear error when the district court commits an error of law that affects its fact-finding analysis. See Uno v. City of Holyoke, 72 F.3d 973, 978 (1st Cir. 1995) ("[T]he jurisprudence of clear error 'does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the

governing rule of law.'" (quoting Thornburg v. Gingles, 478 U.S. 30, 106 (1986))).

This standard of review tracks the Supreme Court's framework for appellate review of claims of excessive punishment or fines under the Eighth Amendment. United States v. Bajakajian, 524 U.S. 321, 336-37 & n.10 (1998). In Bajakajian, the Supreme Court concluded that the excessiveness of a fine was a question properly considered de novo by appellate courts, applying "the standard of gross disproportionality articulated in [its] Cruel and Unusual Punishments Clause precedents." Id. at 336. "[T]he application of a constitutional standard to the facts of a particular case," the Supreme Court reasoned, may appropriately require de novo appellate review to ensure consistency in the law's development. Id. at 336 n.10; see also Cooper Indus. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 435-36 (2001) (extending de novo review of the excessiveness inquiry associated with the Excessive Fines Clause of the Eighth Amendment to punitive damages awards); Ornelas, 517 U.S. at 699 (holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal").

The considerations set forth in Ornelas, and applied in Bajakajian and Leatherman Tool, are equally relevant here. "Medical 'need' in real life is an elastic term," Battista, 645 F.3d at 454, "that take[s its] substantive content from the

-44-

particular context[] in which the standards are being assessed."
Ornelas, 517 U.S. at 696.  Similarly, the "legal rules" for what
constitutes care in violation of the Eighth Amendment "acquire
content only through application" -- a fact which favors de novo
appellate review "to maintain control of, and to clarify, the legal
principles."  See id. at 697.

## C.  The Objective Prong: Serious Medical Need

To sustain a claim under the objective prong of the
Eighth Amendment, Kosilek must show that she has a serious medical
need for which she has received inadequate treatment.  See Estelle,
429 U.S. at 106; Sires, 834 F.2d at 13 (finding no Eighth Amendment
violation where the prisoner failed to "present[] any evidence of
a serious medical need that has gone unmet"); see also Derbes, 369
F.3d at 583 (a prison's constitutional obligation to provide
medical services does not require "a perfect plan for every
inmate"); DeCologero, 821 F.2d at 42 ("[T]hough it is plain that an
inmate deserves adequate medical care, he cannot insist that his
institutional host provide him with the most sophisticated care
that money can buy.").  A significant risk of future harm that
prison administrators fail to mitigate may suffice under the
objective prong.  Helling v. McKinney, 509 U.S. 25, 35 (1993); see
also Baze v. Rees, 553 U.S. 35, 50 (2008) ("[S]ubjecting
individuals to a risk of future harm . . . can qualify as cruel and
unusual punishment."); Roe v. Elyea, 631 F.3d 843, 858 (7th Cir.

-45-

2011) ("[T]he Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her <u>current</u> serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to <u>future</u> health.'" (quoting <u>Board</u> v. <u>Farnham</u>, 394 F.3d 469, 479 (7th Cir. 2005))).

That GID is a serious medical need, and one which mandates treatment, is not in dispute in this case. The parties do not spar over the fact that Kosilek requires medical care aimed at alleviating the harms associated with GID -- to the contrary, the DOC has provided such care since 2003. Rather, the parties disagree over whether SRS is a medically necessary component of Kosilek's care, such that any course of treatment not including surgery is constitutionally inadequate. The parties' disparate positions on this issue are fit for succinct summary.

Kosilek argues that the <u>only</u> constitutionally sufficient treatment regimen is to adhere to the Standards of Care's triadic sequence in full, including the provision of SRS. Kosilek emphasizes that doctors at both UMass and Fenway Clinic -- doctors hired by the DOC -- confirmed at trial that SRS was "medically necessary." The failure to provide treatment, these doctors testified, would almost certainly lead to a deterioration in Kosilek's mental state and a high likelihood of self-harming behaviors. In light of this risk, and given that they believed Kosilek had successfully met all eligibility criteria for SRS,

-46-

these doctors believed that any course of treatment excluding SRS is insufficient to treat Kosilek's GID.

In contrast, the DOC argues that full progression through the Standards of Care's triadic sequence is not the only adequate treatment option, as Kosilek's GID may be appropriately managed with treatment short of SRS. The DOC maintains that the evidence does not meet the standards for negligent treatment of a medical condition, much less the higher Eighth Amendment standard. See Estelle, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); Watson, 984 F.2d at 540 (stating that "simple medical malpractice" does not "rise[] to the level of cruel and unusual punishment").

Relying on the advice of accredited medical professionals, the DOC argues that its alternative course of treatment -- which provides Kosilek such alleviative measures as psychotherapy, hormones, electrolysis, and the provision of female garb and accessories -- is sufficient to treat Kosilek's GID and far exceeds a level of care that would be "so inadequate as to shock the conscience." See Torraco, 923 F.2d at 235 (quoting Sires, 834 F.2d at 13). Moreover, this course of treatment has, in practice, greatly diminished Kosilek's mental distress and allowed her a fair measure of contentment. Should suicidal ideation arise

in the future, the DOC contends that -- based on the advice of its medical experts and its own penological experience -- it would be able to address that future risk appropriately through psychotherapy and antidepressants.

We begin by discussing the district court's conclusions regarding the objective prong. We then examine de novo the question whether the treatment offered was constitutionally adequate.

### 1. The district court's medical prudence determination

The district court ruled that SRS was a medically necessary treatment, and that Dr. Schmidt's alternative belief was outside the bounds of medical prudence.[9] However, the court's finding that Dr. Schmidt's views were medically imprudent was based on several erroneous determinations.

First, the court ruled that, unlike prudent medical professionals, Dr. Schmidt did not "follow" the Standards of Care in his treatment of GID. This finding ignored critical nuance in Dr. Schmidt's testimony and based its conclusion on a severely strained reading of Dr. Levine's expert testimony.

---

[9] For the sake of clarity, we reiterate that medical imprudence -- without more -- is insufficient to establish an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06; Watson, 984 F.2d at 540. Instead, a prisoner must satisfy both prongs of the Eighth Amendment inquiry, proving that the level of care provided is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.

As an initial matter, the Standards of Care themselves admit of significant flexibility in their interpretation and application. They state, for example, that "[t]he Standards of Care [a]re Clinical Guidelines" and are "intended to provide flexible directions" to medical professionals in crafting treatment plans. Standards of Care at 1 (emphases added). The Standards of Care also specifically warn that "[a]ll readers should be aware of the limitations of knowledge in this area." Standards of Care at 1. "Individual professionals and organized programs," the Standards of Care continue on, "may modify [the standards]" as appropriate. Id. at 2. Dr. Levine's testimony acknowledged this flexibility:

> [DR. LEVINE]: [T]he "Standards of Care" was a consensus document from people from seven different countries or something, you know, who come from different systems, and it was a political process that forged together a set of standards . . . . So "prudent" is a wonderful word, but it's not like it has one simple definition.
>
> . . .
>
> THE COURT: But is this an area in which you think prudent professionals can reasonably differ as to what is at least minimally adequate treatment for this condition?
>
> [DR. LEVINE]: Yes, and do.

Moreover, the district court put great weight on the fact that the Standards of Care require that patients receive two letters of recommendation prior to SRS. The court concluded,

-49-

therefore, that "prudent professionals who treat individuals suffering from severe gender identity disorders write such letters of recommendation," and it faulted Dr. Schmidt as imprudent for his failure to engage in this practice.  In so doing, the court relied on Dr. Levine's testimony, which it believed stated that a prudent professional would not "[refuse] to write letters of recommendation."

Dr. Schmidt's testimony, however, makes clear that although he does not advocate or recommend surgery to his patients, if a patient chooses to seek SRS, he releases all of their medical files to a surgeon and writes that surgeon a letter confirming that the patient is eligible for surgery.  Insofar as Dr. Schmidt had not advocated for the surgery, this neutrality aligns with what Dr. Levine describes as the accepted practice for doctors in the treatment of GID: "[i]f the patient meets eligibility requirements . . . we then write a letter of support . . . I understand how others may perceive this as a recommendation . . . [but] we tell ourselves we are opening a gate to their decision."  Therefore, whatever the semantic force of the district court's distinction, we see no material difference between the letters written by Dr. Schmidt confirming a patient's readiness for surgery and what the Standards of Care refers to as a letter of recommendation.

The district court next concluded that Dr. Schmidt was imprudent because antidepressants and psychotherapy alone are

inadequate to treat GID. Again, the court claimed that it relied on the testimony of Dr. Levine, but misconstrued his testimony in support of its conclusion. Dr. Levine did in fact state that "gender dysphoria is not significantly ameliorated . . . by treating [patients] with a prozac-like drug alone." He continued on, however, to explain that he did not believe this was the treatment plan advocated by Dr. Schmidt or the DOC. To the contrary, he understood that Kosilek would continue to receive ameliorative treatment for her GID and, if she entered a depressive or suicidal state based on her inability to receive SRS, antidepressants and psychotherapy would be used to help stabilize her mental state so as to alleviate the risk of suicide while working with her to craft new perspectives and life goals beyond surgery. He felt that the treatment might well be successful in this capacity, when combined with the direct alleviative treatments currently provided.

Finally, the district court found Dr. Schmidt imprudent because he did not believe that a real-life experience could occur in prison, given that it was an isolated, single-sex environment. The district court disagreed, stating that it had concluded a real-life experience could occur in prison, as Kosilek would remain incarcerated for her entire life. In reaching this determination, the court made a significantly flawed inferential leap: it relied on its own -- non-medical -- judgment about what constitutes a

real-life experience to conclude that Dr. Schmidt's differing viewpoint was illegitimate or imprudent. Prudent medical professionals, however, do reasonably differ in their opinions regarding the requirements of a real-life experience -- and this reasonable difference in medical opinions is sufficient to defeat Kosilek's argument. Cf. Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) ("Nothing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor . . . ."); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996); Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).

In fact, Dr. Levine noted that an incarcerative environment might well be insufficient to expose Kosilek to the variety of societal, familial, and vocational pressures foreseen by a real-life experience. This viewpoint aligned with that of Dr. Schmidt and Osborne. And, although Dr. Forstein's written report appears to presume Kosilek had completed a real-life experience, it echoed this same point: "being in prison has helped [Kosilek] consolidate her desire . . . simplifying the issues, without the stressors and choices that she would have had to make out in the outside real world." We find no support for the district court's conclusion that no reasonable medical expert could opine that Kosilek lacked real-life experience, particularly in light of the contrary testimony from medical experts concerning the range of

social, environmental, and professional considerations that are necessary to constitute a real-life experience under the Standards of Care. The district court thus erred by substituting its own beliefs for those of multiple medical experts.[10]

The district court's finding of medical imprudence relied heavily on inferences we do not believe can rightly be drawn from Dr. Levine's testimony; this finding also ignored significant contrary evidence regarding the breadth and variety of acceptable treatments for GID within the medical community.[11] Its conclusion that the Fenway Center's recommendation constituted the sole acceptable treatment plan is, thus, contradicted by the record.

---

[10] There are obvious reasons for the range of judgments in this area. Although the medical experts disagreed over whether experience in a prison setting could qualify as real-life experience, none of the experts who opined that it could do so appear to have considered the fact that after SRS, Kosilek would most likely be housed in the drastically different setting of a female facility. This distinction was reflected in Dr. Forstein's report, which stated that "[Kosilek's] 'real life experience' leads her to the conclusion that so long as she is in a male prison . . . she cannot perceive herself as a true woman." This statement acknowledges that any real-life experience available to Kosilek was shaped by her current, all-male prison environment. Kosilek introduced no evidence to show that her experience there would satisfy the requirement that she have real-life experience in her post-operative housing environment.

[11] The district court ignored or minimized significant portions of Dr. Levine's testimony on the theory that the doctor had based his evaluation of medical prudence on the "erroneous assumption[]" that Kosilek may not have had a real-life experience in prison and faced no other extrinsic obstacles to surgery. As explained above, in doing so the court improperly supplanted a question of medical opinion -- on which experts may differ -- with its own decision based on a layman's view, and terming all contrary views imprudent.

-53-

## 2.  Adequacy of the DOC's treatment plan

Regarding the medical adequacy of Kosilek's treatment, the district court held that psychotherapy and antidepressants alone would not adequately treat Kosilek's GID.  This finding mischaracterizes the issues on appeal and unduly minimizes the nature of the DOC's preferred treatment plan.  The DOC does not claim that treating Kosilek's GID merely with therapy and antidepressants alone would constitute adequate care.  Cf. Fields v. Smith, 653 F.3d 550, 556 (7th Cir. 2011) (accepting, in the absence of contrary evidence, expert testimony that "psychotherapy as well as antipsychotics and antidepressants . . . do nothing to treat the underlying disorder [of GID]").  In fact, since Kosilek I the DOC has acknowledged the need to directly treat Kosilek's GID.  Beginning in 2003, it has provided hormones, electrolysis, feminine clothing and accessories, and mental health services aimed at alleviating her distress.  The parties agree that this care has led to a real and marked improvement in Kosilek's mental state.  There is also no dispute that this care would continue, whether or not SRS is provided.

The question before our court, therefore, is not whether antidepressants and psychotherapy alone are sufficient to treat GID, or whether GID constitutes a serious medical need.  Rather, the question is whether the decision not to provide SRS -- in light of the continued provision of all ameliorative measures currently

-54-

afforded Kosilek and in addition to antidepressants and psychotherapy -- is sufficiently harmful to Kosilek so as to violate the Eighth Amendment. It is not. See Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003) ("[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."); see also Estelle, 429 U.S. at 106 (requiring proof of "acts or omissions sufficiently harmful" as to illustrate deliberate indifference to a serious medical need); Estate of Bearden ex rel. Bearden v. Anglin, 543 F. App'x 918, 921 (11th Cir. 2013); Leavitt, 645 F.3d at 497.

Kosilek admits that the DOC's current treatment regimen has led to a significant stabilization in her mental state. Kosilek's doctors testified to the same, highlighting her "joy around being feminized." This claim is also borne out by the passage of significant time since she exhibited symptoms of suicidal ideation or attempted to self-castrate. In addition to alleviating her depressive state, this treatment has also resulted in significant physical changes and an increasingly feminine appearance.

The significance of a future risk of suicidality is not one that this court takes lightly, and Kosilek is right to note that a clear risk of future harm may suffice to sustain an Eighth

Amendment claim.  See Helling, 509 U.S. at 35 (determining that an "unreasonable risk" of future harm may amount to an Eighth Amendment violation); Baze, 553 U.S. at 49; Roe, 631 F.3d at 858. Nonetheless, the risk of suicidal ideation is born from Kosilek's GID-related mental distress.  Therefore an assessment of the gravity of that risk, and its appropriate treatment, must encompass the entirety of the DOC's treatment plan, not merely the potential addition of psychotherapy and antidepressants.

Kosilek is provided hormones, facial hair removal, feminine clothing and accessories, and access to regular mental health treatment.  The DOC also stands ready to protect Kosilek from the potential for self-harm by employing its standard and accepted methods of treating any prisoner exhibiting suicidal ideation.  Trial testimony established that this plan offers real and direct treatment for Kosilek's GID.  It employs methods proven to alleviate Kosilek's mental distress while crafting a plan to minimize the risk of future harm.  See Carpenter, 316 F.3d at 186. It does not wantonly disregard Kosilek's needs, but accounts for them.  See Torraco, 923 F.2d at 235.

The law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to "second guess medical judgments" or to require that the DOC adopt the more compassionate of two adequate options.  Layne v.

Vinzant, 657 F.2d 468, 474 (1st Cir. 1981) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); Bismark, 213 F. App'x at 897; Medrano v. Smith, 161 F. App'x 596, 599 (7th Cir. 2006); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Bowring, 551 F.2d at 48.

That the DOC has chosen one of two alternatives -- both of which are reasonably commensurate with the medical standards of prudent professionals, and both of which provide Kosilek with a significant measure of relief -- is a decision that does not violate the Eighth Amendment.[12]

Kosilek warns, however, that upholding the adequacy of the DOC's course of treatment in this case -- despite her medical

---

[12] This holding in no way suggests that correctional administrators wishing to avoid treatment need simply to find a single practitioner willing to attest that some well-accepted treatment is not necessary. We do not establish here a per se rule allowing a dissenting medical opinion to carry the day. Rather, our determination is limited to the particular record on appeal, which involves a medical condition that admits of a number of valid treatment options. This fact was testified to by Dr. Levine, recognized by the UMass doctors in their correspondence with the DOC, and corroborated by Dr. Forstein in his written report.

The DOC did not engage in a frenzy of serial consultations aimed at finding the one doctor out of a hundred willing to testify that SRS was not medically necessary. Rather, it made a considered decision to seek out a second opinion from an expert previously considered in its initial selection process. Our opinion rests on the facts presented in this record, and we find merely that the regimen of care provided by the DOC -- which includes hormonal treatments as well as feminine products, clothing, and hair removal, and which has successfully alleviated the severity of a prisoner's distress -- is not sufficiently harmful to Kosilek to constitute an Eighth Amendment violation.

history and record of good behavior -- will create a de facto ban against SRS as a medical treatment for any incarcerated individual. We do not agree. For one, the DOC has specifically disclaimed any attempt to create a blanket policy regarding SRS. We are confident that the DOC will abide by this assurance, as any such policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs. See, e.g., Roe, 631 F.3d at 862-63 (holding that the failure to conduct an individualized assessment of a prisoner's needs may violate the Eighth Amendment).

For another, this case presents unique circumstances; we are simply unconvinced that our decision on the record before us today will foreclose all litigants from successfully seeking SRS in the future. Certain facts in this particular record -- including the medical providers' non-uniform opinions regarding the necessity of SRS, Kosilek's criminal history, and the feasibility of post-operative housing -- were important factors impacting the decision.

## D. The Subjective Prong: Deliberate Indifference

### 1. The DOC's reliance on medical experts

The subjective element of an Eighth Amendment claim for injunctive relief requires not only that Kosilek show that the treatment she received was constitutionally inadequate, but also that the DOC was -- and continues to be -- deliberately indifferent

to her serious risk of harm.  See Farmer, 511 U.S. at 844-45.[13]  On the record presented, this is a burden Kosilek cannot meet.  Even if the district court had been correct in its erroneous determination that SRS was the only medically adequate treatment for Kosilek's GID, the next relevant inquiry would be whether the DOC also knew or should have known this fact, but nonetheless failed to respond in an appropriate manner.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  In answering this question, it is not the district court's own belief about medical necessity that controls, but what was known and understood by prison officials in crafting their policy.  Id. at 300 (requiring a showing of purposefulness or intent on the part of prison administrators).

In this case, the DOC solicited the opinion of multiple medical professionals and was ultimately presented with two alternative treatment plans, which were each developed by different medical experts to mitigate the severity of Kosilek's mental distress.  The choice of a medical option that, although disfavored by some in the field, is presented by competent professionals does

_____

[13]  Although the DOC has not specifically argued that the conflicting medical opinions preclude a finding of subjective deliberate indifference, we do not find this argument waived.  As we have explained above, the subjective and objective analyses overlap.  See supra note 7; see also Leavitt, 645 F.3d at 498.  The DOC's contention that the district court erred in deeming SRS medically necessary and in rejecting Dr. Schmidt's approach as imprudent necessarily entails the DOC's subjective belief that SRS was unnecessary.  The contrary position -- i.e., that SRS is not objectively necessary but that the DOC did not disagree as to the need for SRS -- would be wholly illogical.

-59-

not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation.[14] Cf. Torraco, 923 F.2d at 234 ("[T]his court has hesitated to find deliberate indifference to a serious need '[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment,' [but] deliberate indifference may be found where the attention received is 'so clearly inadequate as to amount to a refusal to provide essential care.'" (internal citations omitted)). Moreover, a later court decision -- ruling that the prison administrators were wrong in their estimation of the treatment's reasonableness -- does not

---

[14]   If the prison itself should have been aware that some of the medical advice it was receiving was imprudent -- that is, if any layperson could have realized that the advice was imprudent -- then the decision to still follow that advice may qualify as deliberate indifference. See Farmer, 511 U.S. at 846 n.9 ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness . . . ."); Hadix v. Johnson, 367 F.3d 513, 526 (6th Cir. 2004) ("If [the challenged prison conditions] are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials."). The facts of this case, however, are highly distinct from such a scenario.

Nor did the district court's conclusion render the DOC's continued refusal to provide SRS deliberately indifferent. On the contrary, the evidence was conflicting as to the medical need for SRS. The choice between reasonable medical views was not for the district court to make, and the DOC remained entitled to reasonably rely on Schmidt's and Osborne's expert opinions. Moreover, even assuming arguendo that the DOC was on notice that its treatment was insufficient, the DOC's continued refusal also rested on valid security concerns, discussed below, such that its actions did not amount to deliberate indifference in any event.

-60-

somehow convert that choice into one exhibiting the sort of obstinacy and disregard required to find deliberate indifference. Cf. Nadeau v. Helgemoe, 561 F.2d 411, 417 (1st Cir. 1977) (refusing to "substitute the values and judgment of a court for the values and judgment of the . . . prison administration").

### 2. The DOC's security concerns

The subjective prong also recognizes that, in issues of security, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547. Although we cannot "abdicate our responsibility to ensure that the limits imposed by the Constitution are not ignored," Blackburn v. Snow, 771 F.2d 556, 562 (1st Cir. 1985), we do not sit to substitute our own judgment for that of prison administrators, see Nadeau, 561 F.2d at 417. As long as prison administrators make judgments balancing security and health concerns that are "within the realm of reason and made in good faith," their decisions do not amount to a violation of the Eighth Amendment. Battista, 645 F.3d at 454.

The DOC officials explained that they believed SRS would create new security issues, the most significant being the provision of safe housing options for Kosilek after her surgery. They further explained the importance of keeping other inmates from

-61-

believing that they could use threats of suicide to extract concessions from the prison administration. Nonetheless, rather than deferring to the expertise of prison administrators, the district court ignored the DOC's stated security concerns, reasoning both that Kosilek could be housed safely and that the DOC had not acted out of a legitimate concern for Kosilek's safety and the security of the DOC's facilities. As explained below, this was in error.

### a. The DOC's concerns about safety and security were reasonable

Recognizing that reasonable concerns would arise regarding a post-operative, male-to-female transsexual being housed with male prisoners takes no great stretch of the imagination. See Farmer, 511 U.S. at 848-49 (summarizing evidence that a prison's refusal to provide segregated housing to a pre-operative male-to-female transsexual could pose significant security concerns). At the same time, as particularly relevant in Kosilek's case, the DOC's security report reflected that significant concerns would also arise from housing a formerly male inmate -- with a criminal history of extreme violence against a female domestic partner -- within a female prison population containing high numbers of domestic violence survivors. Nonetheless, in dismissing the DOC's concerns, the district court relied heavily on the fact that security issues have not yet arisen within MCI-Norfolk's general population. Rejecting the testimony of multiple

individuals with decades of penological experience -- all of whom acknowledged the risk of housing a female prisoner at MCI-Norfolk -- the district court reasoned that Kosilek's past safety was indicative of a likelihood that she could reside safely at the prison after her operation.

This reasoning wrongly circumvents the deference owed to prison administrators: the appropriate inquiry was not whether the court believed that Kosilek could be housed safely, but whether the DOC has a reasoned basis for its stated concerns. Indeed, that Kosilek had so far been safe within MCI-Norfolk's prison population does not negate the DOC's well-reasoned belief that safety concerns would arise in the future after SRS. Cf. Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 132-33 & n.9 (1977) (holding, in the First Amendment context, that the rights of prisoners may be abridged based on a reasonable belief that future harm or disruption may occur); cf. Hudson v. Palmer, 468 U.S. 517, 526-27 (1984) (requiring prison administrators to implement prophylactic solutions to foreseeable security issues reasonably within the scope of their expertise). Moreover, the fact that, pre-operatively, Kosilek has not been subject to assault or threats does not vitiate the concern that she would be victimized after receiving SRS.[15]

---

[15] These concerns were obvious to more than just those individuals within the DOC with significant penological experience. The likelihood that issues surrounding secure housing would arise after

The district court also reasoned that "the DOC [could] reasonably assure the safety of Kosilek and others after sex reassignment surgery by housing Kosilek in a segregated protective custody unit." It then noted, however, that there existed a strong argument that such isolation would amount to "a form of extrajudicial punishment that is prohibited by the Eighth Amendment." This warning echoes the very concerns highlighted by the DOC, which expressed disagreement with the use of long-term isolation as a housing solution for Kosilek, based on its potential negative effects on her mental health. See also Battista, 645 F.3d at 454 (explaining that creating a segregated treatment center to house a GID prisoner would "pose administrative difficulties and be isolating"). The deference awarded to prison administrators cannot be defeated by such circular reasoning, which dismisses the DOC's concern in one breath only to recognize its validity in the next.

The prison administrators in this case have decades of combined experience in the management of penological institutions, and it is they, not the court, who are best situated to determine what security concerns will arise. See Bell, 441 U.S. at 548 ("[J]udicial deference is accorded [in part] because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge . . . ."). The DOC's judgment

---

SRS was also acknowledged by Kosilek's treating psychologist, Mark Burrows, and by the Fenway Center doctors in their initial report.

regarding post-operative housing is without doubt "within the realm of reason," <u>Battista</u>, 645 F.3d at 454, and the district court's alternative belief as to the possibility of safely housing Kosilek does not suffice to undermine this reasonableness.

The DOC officials also expressed concern that providing Kosilek SRS would incentivize the use of suicide threats by prisoners as a means of receiving desired benefits. Although the district court determined that, in this case, Kosilek's risk for suicidal ideation was very real, this finding does not invalidate the DOC's reasonable belief that providing SRS might lead to proliferation of false threats among other prisoners.

The DOC's concern -- regarding the unacceptable precedent that would be established in dealing with future threats of suicide by inmates to force the prison authorities to comply with the prisoners' particular demands -- cannot be discounted as a minor or invalid claim. Such threats are not uncommon in prison settings and require firm rejection by the authorities, who must be given ample discretion in dealing with such situations. Given the circumstances presented here, we cannot say that the DOC lacks reasonable security concerns.

### b. Deference to the DOC's reasonable concerns about safety and security

The district court ultimately dismissed the DOC's concerns as pretextual, reasoning that DOC was in fact acting in response to "public and political criticism." The primary evidence

on record tending to support this theory includes a press interview by Commissioner Dennehy, Dennehy's relationships with a state senator and the lieutenant governor, and the acknowledgment that the DOC was aware of negative news coverage regarding Kosilek's request for surgery.

In her testimony, Dennehy denied being influenced by such media and political pressures, and stated that the decision not to provide SRS was founded in bona fide security concerns alone. The district court, however, found this testimony non-credible, and this credibility finding is the sort of determination to which our court gives deference. See Fed. R. Civ. P. 52(a)(6). Even accepting that Dennehy's motivations were colored by political and media pressure, however, does not take Kosilek's claim as far as it needs to go.

As an initial matter, the fact that Dennehy was motivated in part by concerns unrelated to prison security does not mean that the security concerns articulated by the DOC were irrelevant, wholly pretextual, or -- most importantly -- invalid on the merits. In Battista, our court held that deference to the decisions of prison administrators could be overcome where those administrators admittedly relied on inflated data, identified a security concern only several years after refusing to provide treatment for an acknowledged medical need, and engaged in a pattern of changing positions and arguments before the court. Battista, 645 F.3d at

455.  Such gross delays and misstatements were not present here.[16]

Rather, the DOC testified consistently that it believed the post-operative security concerns surrounding Kosilek's treatment were significant and problematic.[17]  Even if not entitled to deference, see id., those concerns still matter insofar as they are reasonable and valid, and Kosilek did not put on any evidence showing that they wholly lacked merit.[18]

---

[16] Great weight was placed on the fact that Dennehy told a reporter that there were significant security concerns about post-operative housing three days before she met with Superintendents Spencer and Bissonnette.  The record reveals, however, that discussions about housing had previously occurred at Executive Staff Meetings, and Dennehy testified that she had conducted phone calls with both Superintendents prior to meeting to formalize their security report.  This timeline, therefore, is far from sufficient to establish that the DOC's security assessments were unprincipled or invalid.

[17]  That the DOC may have, in the district court's assessment, engaged in a pattern of prevarication regarding whether they understood that SRS was being recommended by UMass as medically necessary, does not undercut the consistency with which they identified safety and security concerns -- concerns which are within their expert province -- that would arise from the surgery.

[18]  Kosilek did cross-examine Commissioner Clarke to show that a transgendered prisoner had safely been housed in a Washington State prison under his supervision.  Left unexplored, however, were the numerous ways in which MCI-Norfolk's environment, facilities, or population might be distinct from this prison in Washington.  Neither was there a comparison between that prisoner's criminal history and the criminal history of Kosilek.  That an individual was housed safely by Commissioner Clarke while employed in another state does not rebut Superintendent Bissonnette's testimony that moving her to MCI-Framingham would cause climate problems in that particular prison.  See Feeley v. Sampson, 570 F.2d 364, 371 (1st Cir. 1978) (rejecting uniform housing conditions for detainees, without regard to their disparate criminal history, because "Constitutional rights cannot be defined in terms of literal comparisons of this nature").

Second, when determining the appropriateness of injunctive relief, our focus must include "current attitudes and conduct." Farmer, 511 U.S. at 845 ("'[D]eliberate indifference[] should be determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and persisting thereafter." (quoting Helling, 509 U.S. at 36)). Dennehy has not served as DOC Commissioner since 2007. Given the age of this litigation and the changes in DOC leadership that have occurred since the suit was filed, the district court's assumption that Dennehy's attitudes necessarily carried over to her successors and governed their actions is unsupported by the record. Although consideration of Dennehy's motivation is surely relevant, it is insufficient to show that the DOC continued to be motivated by public pressure even after her departure, or that this is what motivates the DOC presently.

Indeed, it was Commissioner Clarke -- and not Dennehy -- who made the decision here. And the only evidence tending to show that Commissioner Clarke may have considered public and political criticism were two letters received by Clarke -- who did not respond -- from Massachusetts legislators. These letters, however, relate almost in their entirety to concerns about the cost of SRS, and the district court soundly rejected any argument that the DOC, or Clarke specifically, had adopted its safety and security measures as a pretextual means of addressing the cost concerns

raised by state legislators.  Moreover, Clarke was never found by the court to be noncredible.[19]

The district court improperly imputed its belief that Commissioner Dennehy had acted out of concern for public and political pressure to its assessment of the motivations of future DOC Commissioners.  This error ignores the requirement, in cases of injunctive relief, that a court consider the attitudes and beliefs of prison administrators at the time of its decision.  Id. at 845-46.  The effect of this error is particularly clear given that Clarke has now been replaced by Commissioner Spencer, so that Dennehy is now several administrations and more than seven years removed from the decisionmaking process.  Without proof that the DOC remains motivated by pretextual or improper concerns with public pressure, even if it was assumed that Dennehy was improperly motivated, the district court's finding that injunctive relief was required is unsupportable.

### III.  Conclusion

We are not tasked today with deciding whether the refusal to provide SRS is uncompassionate or less than ideal.  Neither finding would support Kosilek's claims of a constitutional violation.  The Eighth Amendment, after all, proscribes only medical care so unconscionable as to fall below society's minimum

---

[19]  We further note that the DOC has not defended this case based on cost considerations relating to the provision of SRS.

standards of decency.  See Estelle, 429 U.S. at 102-05.  In this case, the DOC has chosen to provide a form of care that offers direct treatment for Kosilek's GID.  Cf. Leavitt, 645 F.3d at 498 (acknowledging that the effects of treatment decisions may be relevant to consideration of the subjective component of the Eighth Amendment).  Moreover, it has done so in light of the fact that provision of SRS would create new and additional security concerns -- concerns that do not presently arise from its current treatment regimen.

Given the positive effects of Kosilek's current regimen of care, and the DOC's plan to treat suicidal ideation should it arise, the DOC's decision not to provide SRS does not illustrate severe obstinacy or disregard of Kosilek's medical needs. DesRosiers, 949 F.2d at 19 ("[T]he complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain.").  Rather, it is a measured response to the valid security concerns identified by the DOC.  Battista, 645 F.3d at 454 ("Medical 'need' in real life is an elastic term:  security considerations also matter at prisons. . . .");  Cameron, 990 F.2d at 20 ("Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments.").  Having reviewed the record before us, we conclude that Kosilek has failed, on these facts, to demonstrate an Eighth Amendment violation.  Accordingly, we reverse the district court's order of injunctive relief and

remand this case to the district court with instructions to dismiss the case.

**Reversed and Remanded.**

**-Dissenting Opinions Follow-**

**THOMPSON, Circuit Judge, dissenting.** The majority turns a blind eye to binding precedent, opting instead to cobble together law from other circuits and non-Eighth Amendment jurisprudence to formulate a standard of review that, though articulated as one of variable exactitude, amounts to sweeping de novo review. Armed with the ability to take a fresh look at findings that clearly warranted deference, the majority easily steps into the trial judge's shoes -- the inarguable superiority of the judge's ability to marshal facts, assess motive, and gauge credibility all but forgotten. The parameters set by the majority foretold the result. It concludes that the Massachusetts Department of Correction did not violate Michelle Kosilek's constitutional rights. That conclusion is erroneous, the majority's analytical path to it is misguided, and the fact that this case is even subject to en banc scrutiny in the first place is wrong. And so I dissent.

### I. En Banc Grant

The criteria for en banc relief are clear: it is not a favored form of relief, and ordinarily should not be ordered unless "(1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a). My colleagues' reasons for granting en banc review are not articulated, but it seems clear that the maintenance of uniformity piece is not in play. Therefore I can only assume they perceive an

-72-

issue of exceptional importance. This justification is problematic.

As my colleague has explained in a series of thoughtful dissents, in this circuit there has been what some might see "as the recurring unprincipled denial and granting of petitions for rehearing en banc, without any attempt to define and apply a set of objective criteria to determine when a case is of exceptional importance." Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 474 (1st Cir. 2013) (Torruella, J., dissenting); see also Igartúa v. United States, 654 F.3d 99, 105 (1st Cir. 2011) (Torruella, J., filing opinion concerning denial of en banc consideration); United States v. Vega-Santiago, 519 F.3d 1, 7 (1st Cir. 2008) (Torruella, J., dissenting). I am at a loss to see what objective criteria warranted review in this case.

While the relief ordered by the district court, and affirmed by a majority of the original panel, was unprecedented, Kosilek's case is not a legally complicated one. Rather it is a fact-intensive dispute, which required the original panel to determine whether the district court's take on the significant amount of evidence, and its ultimate holding as to the existence of an Eighth Amendment violation, was erroneous. I fail to see what in this framework made this case worthy of en banc review.

I am not implying this case is unimportant. This litigation is significant to Kosilek, the DOC, and many others, and

the rights afforded under the Eighth Amendment are crucial.  But if those things alone were enough, nearly every case would attract the full court's attention.  And a good deal more cases would be heard en banc if disagreeing with the result reached by the original panel, or simply desiring to weigh in, were valid grounds for awarding en banc review.  They are not, but unfortunately I suspect they were the grounds that carried the day here.  <u>See</u>, <u>e.g.</u>, <u>Kolbe</u>, 738 F.3d at 474 (Torruella, J., dissenting) ("En banc consideration is not for the purpose of correcting panel decisions.") (citing <u>Calderón</u> v. <u>Thompson</u>, 523 U.S. 538, 569 (1998) (Souter, J., dissenting)).

This case does not satisfy the well-settled requirements for a grant of en banc.  Lamentably, a majority of this court decided otherwise.  Similarly, a majority has decided that the district court got it wrong.  That conclusion is fundamentally flawed, starting with the level of scrutiny paid to the lower court's decision.

## II. Standard of Review

The issue of what standard of review should be employed is a significant point of divergence for me, and indeed one that permeates the entirety of my discord with the majority.  The majority, undoubtedly aware that it could more handily toss aside the district court's findings if it utilized a non-deferential standard of review, formulates its standard by borrowing liberally

from other circuits and non-Eighth Amendment jurisprudence while disregarding on-point case law from this circuit. The end result is a standard that, in theory, afforded minimal deference to the lower court's finding, and in the majority's actual application, afforded essentially none.

Let me start with our common ground. I agree with the majority that different standards of review are in play. When deciding a post-bench-trial appeal, this court takes up questions of law de novo, but reviews findings of fact for clear error only. Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009). On the latter point, this means we accept the court's factual findings, and the inferences drawn from those facts, unless the evidence compels us to conclude a mistake was made. Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 138 (1st Cir. 2006). With inquiries that are more of a mixed bag, there is a continuum. Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995). The more fact-intensive the question, the more deferential our review. Id. Conversely, the more law-dominated the query, the more likely our review is de novo. Id.

That is where the congruity ends. The majority, undoubtedly with a certain end result in mind, maneuvers the standard of review into its most favorable form. While it correctly acknowledges that factual and legal issues are implicated, the majority utterly favors the de novo end of the

spectrum.[20]  This approach does not accord with our case law

(although to read the majority you would think we had very little

on-point jurisprudence in this circuit).

For one, the majority posits that the issue of deliberate

indifference is a legal one to be reviewed de novo.  It relies on

Fourth Amendment jurisprudence, citing criminal cases that, in the

context of deciding the validity of searches and seizures, hold

that reasonable suspicion and probable cause determinations should

receive de novo appellate review.  See Ornelas v. United States,

517 U.S. 690, 699 (1996); United States v. Camacho, 661 F.3d 718,

724 (1st Cir. 2011).  I do not see how these cases are analogous to

Kosilek's challenge, nor why we should look to Fourth Amendment

cases rather than our Eighth Amendment jurisprudence.

In the context of the Eighth Amendment, we have explained

that the existence of deliberate indifference is a "state-of-mind

issue" that usually presents a jury question, Torraco v. Maloney,

923 F.2d 231, 234 (1st Cir. 1991), or in other words, an issue for

---

[20] The majority's decision to give little deference to the district
court is undoubtedly a boon to the DOC, and given the DOC's
garbled treatment of the standard of review issue on appeal, it is
a downright windfall.  In violation of our rules, the DOC did not
include a standard of review in its opening brief.  See Fed. R.
App. P. 28(a)(8)(B).  In its reply brief, the DOC gave us a bit
more, arguing that the appropriateness of medical care called for
de novo review but neglecting to indicate what scrutiny a
deliberate indifference finding necessitated.  In its petition for
en banc review, the DOC's position continued to evolve.  It
contended that a heightened standard of review should be applied
because this case involves intertwined issues of law and fact.

the finder of fact.  This makes sense.  Often intertwined in state-of-mind issues are determinations about credibility and motivation; those are classic examples of the judgment calls to which we give deference.  See Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."); Monahan v. Romney, 625 F.3d 42, 46 (1st Cir. 2010).  See also Janeiro, 457 F.3d at 138-39 (explaining that, following a bench trial, "if the trial court's reading of the record [with respect to an actor's motivation] is plausible, appellate review is at an end") (alteration in original).

The majority recognizes Torraco, citing it for the narrow proposition that "issues of culpability in a deliberate indifference inquiry are usually questions for a jury," in connection with its discussion about what standard of review findings of fact garner.  But this is a mischaracterization of what Torraco held.  Rather, the case states that "the existence of deliberate indifference," is a state-of-mind issue, which makes it a typical juror question.  Torraco, 923 F.2d at 234 (emphasis added).  The majority's slight spin on this holding allows it to ignore Torraco, and lean on Fourth Amendment jurisprudence instead to support the notion that deliberate indifference gets a fresh look from this court.

Similarly erroneous is the majority's position that we review de novo the district court's ultimate determination as to

whether an Eighth Amendment violation occurred.  For support it cites to a series of Eighth Amendment cases from other circuit courts.  See, e.g., Thomas v. Bryant, 614 F.3d 1288, 1307 (11th Cir. 2010); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).  At first blush, there is some surface appeal to this position.  If nothing else, the existence of a constitutional violation sounds like something that would fall closer to the question-of-law end of the spectrum.  The problem though is that the ultimate constitutional question is inextricably tied up with the factual details that emerged at trial, the credibility of the witnesses, and the questions of motivation.  This counsels against pure de novo review and our own case law supports this notion.

As explained above, a state-of-mind issue such as the existence of deliberate indifference is typically left to the finder of fact.  Torraco, 923 F.2d at 234.  And when reviewing a trial judge's determination on the adequacy of medical treatment following a bench trial, this court has applied the deferential clearly erroneous standard.  DesRosiers v. Moran, 949 F.2d 15, 19-20 (1st Cir. 1991).  On top of this, it is well established that "elusive issues of motive and intent" (relevant here in connection with the Eighth Amendment's subjective prong) are typically fact-bound ones subject to the clearly erroneous rule.  Fed. Refinance Co. v. Klock, 352 F.3d 16, 27-28 (1st Cir. 2003); see also McIntyre ex rel. Estate of McIntyre v. United States, 545 F.3d 27, 40 (1st

Cir. 2008).  Thus the major pieces of the puzzle in an Eighth Amendment inquiry -- adequacy of medical care, the existence of deliberate indifference, and the parties' motive and intent -- are subject to the clearly erroneous standard, making unqualified de novo review a bad fit.

Policy concerns do not counsel otherwise, making the majority's reliance on Ornelas, 517 U.S. at 690, a Fourth Amendment case, not particularly persuasive.[21]  Ornelas, which characterized the ultimate reasonable suspicion and probable cause determination as a mixed question of law and fact, decided that de novo review was the best fit for its resolution.  Id. at 696-97.  The Supreme Court, as the majority points out, emphasized that "[i]ndependent review" by appellate courts can help "to maintain control of, and to clarify, the legal principles" in reasonable suspicion and probable cause cases.  Id. at 697.  While I do not disagree that as an appellate court we are often required to clarify legal

_____

[21]  The majority also relies on United States v. Bajakajian, 524 U.S. 321 (1998), an Eighth Amendment excessive punishment and fines case, for the same proposition it cites Ornelas for.  Specifically, the majority states that in Bajakajian, the Supreme Court reasoned that the "'application of a constitutional standard to the facts of a particular case' . . . may appropriately require de novo appellate review to ensure consistency in the law's development." Bajakajian does not say this.  The Court there did not address the concept of  consistency of the law; it simply cited Ornelas for the narrower proposition that de novo review attaches to the issue of whether a fine is constitutionally excessive.  See id. 336, n.10. For that reason I focus on Ornelas.

principles and ensure continuity of the law's development, this is not a persuasive justification for employing de novo review here.

As noted by the dissent in Ornelas, "[l]aw clarification requires generalization, and some issues lend themselves to generalization much more than others." Id. at 703 (Scalia, J., dissenting). The issues here do not. Cases dealing with the constitutional adequacy of medical care under the Eighth Amendment are incredibly fact-specific, resulting in distinctive issues. The trial judge must, among other things, have a handle on the prisoner's medical condition, the treatment sought, the treatment provided (if any), what treatment medical providers recommended, what the defendant knew and when, and what motivated its decisions. This court cannot hope to match the district judge's expertise in these areas, nor can I fathom why we would want to try. The "extremely fact-bound nature" of these cases means that "de novo review [will] have relatively little benefit," id. at 700 (Scalia, J., dissenting), leaving us unmoved by the uniformity-of-the-law considerations raised by the majority.

So where does all this leave us with regard to the standard that attaches to the determination of whether the Eighth Amendment has been violated? It is clear (and the majority agrees) that with questions of varying exactitude, the "standard of review applied depends, in the last analysis, on the extent to which a particular question is fact-dominated or law-dominated." Turner v.

United States, 699 F.3d 578, 584 (1st Cir. 2012) (internal quotation marks omitted); see also In re IDC Clambakes, Inc., 727 F.3d 58, 64 (1st Cir. 2013); Dugas v. Coplan, 506 F.3d 1, 8 (1st Cir. 2007). Drawing the distinction between law-heavy versus fact-heavy questions is sometimes a tricky thing to do, and given that establishing an Eighth Amendment claim involves a mixed question of law and fact, it is a thicket into which we must enter. Luckily, I do not think it is a particularly thorny one in this case.

Here, before reaching its ultimate constitutional conclusion, the trial court heard testimony from no fewer than nineteen witnesses (e.g., medical providers, medical experts, prison officials, and Kosilek) over the course of a trial that ultimately extended two years. The court scrutinized events that had transpired over a twenty-year period, including those relating to what treatment Kosilek had requested, what treatment had been recommended, and what care was ultimately provided. The court considered evidence about the DOC's security review, how it was conducted, and the concerns it raised. It assessed the credibility of Kosilek, DOC officials, and the medical experts. The court reviewed a copious amount of exhibits, such as Kosilek's medical records, Kosilek's prison records, DOC policies, DOC contracts, DOC manuals, reports from Kosilek's medical providers, reports penned by each side's experts, DOC staff meeting notes, security reports, medical literature, correspondence, and deposition testimony. The

end result was pages upon pages of factual findings made by the trial judge.[22]

In other words, the district court "engaged in a careful and close analysis of the trial evidence," Turner, 699 F.3d at 584, to make its ultimate determination that the DOC, without any valid penological purpose, refused to provide medically necessary treatment for Kosilek's life-threatening condition.  Given the clearly fact-intensive nature of the court's review, our own examination into whether the court was correct that the DOC violated the Eighth Amendment should be deferential, as opposed to the fresh look the majority proposes.[23]  See id.; Fed. Refinance Co., 352 F.3d at 27 (explaining that the more fact-intensive the question, the more deferential our review).  As ably said by the Supreme Court, "deferential review of mixed questions of law and fact is warranted when it appears that the district court is better positioned than the appellate court to decide the issue in

---

[22]  Indeed the majority dedicates over thirty pages of its opinion to the factual and procedural background in this case.  This is not surprising; those facts are integral to the resolution of the constitutional question.  What is surprising is the majority's failure to see the significance of the factually concentrated nature of this case.

[23]  Plus, even assuming that the conclusion that the DOC's refusal to provide care constituted an Eighth Amendment violation lands closer to the law side of the mixed-question spectrum, a measure of deference is still appropriate.  See Battista v. Clarke, 645 F.3d 449, 454 (1st Cir. 2011) ("The legal labels applied to facts are reviewed on appeal more closely than a district court fact-finding, but often with some deference to the district judge.").

question, or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." Salve Regina Coll. v. Russell, 499 U.S. 225, 233 (1991) (internal quotation marks omitted).

The majority's articulation of a standard of review that runs afoul of our case law is not the only problem. There is also its application. While the majority's skewed standard allows minimal aspects of the lower court's decision to garner clear error review, namely factual findings and credibility determinations, in actual application essentially no deference was paid. The only conclusion of the district court that the majority concedes warranted deference was the judge's determination that Commissioner Kathleen Dennehy's testimony was not credible.[24] Given the voluminous record in this case, and the breadth of the lower court's findings, it is simply unfathomable that the majority did not consider a single other fact-drawn inference, credibility finding, or motive determination, all of which warrant deference.

For instance, the district court drew inferences from the various medical providers' testimony to decide what constituted a prudent approach. It also considered what Commissioner Harold Clarke's motivations were for denying sex reassignment surgery. It drew inferences from the DOC's conduct (e.g., the timing of security reviews and the DOC's communications with Kosilek's

---

[24] Of course the majority then goes on to explain why the court's adverse credibility determination does not matter, a point I will get into later.

medical providers) to determine that the DOC had engaged in prevarication and delay. The majority; however, does not appear to adjust its consideration of these issues to reflect any deference to the trial judge. Rather it decides anew what inferences should be drawn from the facts attested to at trial. Even under the majority's standard, this is not proper.

Without doubt, the level of scrutiny applied by a court permeates its analysis and guides the outcome. The impact here is clear. The Eighth Amendment is violated when prison officials fail to provide an inmate with adequate medical care, such that "their 'acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). The district court concluded that the evidence established the DOC had committed such a violation. The majority says otherwise but its analysis is plagued with flaws, starting with its determination as to the objective prong.

### III. Eighth Amendment: Objective Prong

Whether the so-called objective component of the Eighth Amendment inquiry is satisfied turns on whether the alleged deprivation is "objectively, sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted); Leavitt, 645 F.3d at 497. In this context, a prisoner

with a "serious medical need," <u>Mahan</u> v. <u>Plymouth Cnty. House of Corr.</u>, 64 F.3d 14, 17-18 (1st Cir. 1995), is entitled to adequate medical care, i.e, "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." <u>United States</u> v. <u>DeCologero</u>, 821 F.2d 39, 43 (1st Cir. 1987).

That gender identity disorder is a serious medical need which warrants treatment, is not, as the majority notes, disputed. The disagreement -- both between the parties and amongst this en banc court -- centers around whether the district court correctly found that the DOC's proffered regimen of care was inadequate, and that sex reassignment surgery is the only appropriate treatment for Kosilek. Based on the record, and when one employs the proper standard of review, that conclusion was generously supported by the evidence.

## A. Dr. Schmidt's Prudence

To start, despite the majority's qualms, the district court's conclusion that the DOC's expert, Dr. Chester Schmidt, was not a prudent professional was not clearly erroneous. In his testimony, Dr. Schmidt expressed a good deal of disagreement with the Harry Benjamin Standards of Care, which were widely relied upon by the other medical providers who testified below and which have been generally accepted by courts. <u>See</u>, <u>e.g.</u>, <u>De'Lonta</u> v. <u>Johnson</u>, 708 F.3d 520, 522-23 (4th Cir. 2013) (describing the Standards of

Care as "the generally accepted protocols for the treatment of GID"); <u>Soneeya</u> v. <u>Spencer</u>, 851 F. Supp. 2d 228, 231 (D. Mass. 2012) (noting that the "course of treatment for Gender Identity Disorder generally followed in the community is governed by the 'Standards of Care'"); <u>O'Donnabhain</u> v. <u>Comm'r of Internal Revenue</u>, 134 T.C. 34, 65 (U.S. Tax Ct. 2010) (indicating that the Standards are "widely accepted in the psychiatric profession, as evidenced by the recognition of the standards' triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts").

While, as the majority notes, the Standards of Care have a built-in flexibility, that pliancy appears to stem from the uniqueness of patient needs and the evolution of the gender identity disorder field.[25] Dr. Schmidt's departure from the Standards appeared more fundamental. For instance, the Standards of Care explained that sex reassignment surgery is not "experimental, investigational, elective, cosmetic, or optional in any meaningful sense." Standards of Care, Version 6, at 18. Dr. Schmidt disagreed. In his expert report, he wrote that sex reassignment surgery was a "voluntary, elective choice[] and procedure[]," calling the steps towards reassignment "equivalent to

---

[25] The Standards state: "Clinical departures from these guidelines may come about because of a patient's unique anatomic, social, or psychological situation, an experienced professional's evolving method of handling a common situation, or a research protocol." Standards of Care, Version 6, at 2.

a variety of elective cosmetic non-surgical procedures and elective cosmetic surgical procedures." Another example: the Standards of Care provide that, for persons with severe gender identity disorder, sex reassignment surgery is effective, and when paired with hormone therapy and a real-life experience, "medically indicated and medically necessary." Standards of Care, Version 6, at 18. Dr. Schmidt again was not on board. He testified that generally he does not believe that sex reassignment surgery is medically necessary and his practice manifests this philosophy. In the approximately 300 patients he had evaluated, Dr. Schmidt never recalled seeing even one case of gender identity disorder serious enough to warrant surgery.[26]

For Dr. Schmidt, there was an additional wrinkle. In Dr. Schmidt's opinion, a real-life experience living as the opposite gender could not be effectively replicated in prison, and this counseled against surgery for Kosilek. The district court found that this viewpoint was not prudent. The majority claims that in doing so the court "relied on its own -- non-medical -- judgment

---

[26] The majority makes much of the district judge faulting Dr. Schmidt for not writing letters of recommendation for patients seeking sex reassignment surgery, suggesting that the judge did not appreciate the nuance between opening the door for surgery and advocating for it. I suspect the judge was more broadly concerned with the fact that Dr. Schmidt did not think sex reassignment was ever medically necessary, nor had he ever seen a case where it was warranted. And despite having this strident perspective, Dr. Schmidt nonetheless opened the door for patients to undergo this major medical procedure.

about what constitutes a real-life experience."  This is not accurate.

The court based its determination, back in Kosilek I, on the testimony of Dr. Marshall Forstein and Dr. George Brown, who "convincingly testified [that] Kosilek's 'real life' is prison." Kosilek v. Maloney, 221 F. Supp. 2d 156, 167 (D. Mass. 2002).  Then in Kosilek II, the court found the "credible evidence in the instant case confirmed the conclusion in Kosilek I that a person can have a 'real life experience' in prison."  Kosilek v. Spencer, 889 F. Supp. 2d 190, 232 (D. Mass. 2012).  Evidence before the court in Kosilek II included an expert report from Dr. Forstein, and testimony from Dr. Randi Kaufman, both of whom indicated that Kosilek had undergone a real-life experience in prison.  There was also the February 24, 2005 report from the Fenway doctors, Dr. Kevin Kapila and Dr. Kaufman, which explained that Kosilek had moved successfully through the steps outlined by the Standards of Care.  Then, in their October 7, 2005 report, the Fenway doctors explained at length why Cynthia Osborne's review subtly distorted the concept of the real-life experience, and why Kosilek had completed the real-life test -- a test made even more stringent by the fact that she was living as a female in an all-male prison. Dr. Brown echoed a similar sentiment.  He testified that Kosilek had not only met the minimum real-life experience but had exceeded it.  Dr. Brown focused on the significant amount of information

that existed regarding Kosilek's time in prison, a record that his patients in the outside world would never have.[27]

The record is clear. The district court's determination that Dr. Schmidt's viewpoint about the feasibility of a real-life experience in prison was not based on the judge's own lay opinion. It was, as the district court alluded to, grounded in a significant amount of evidence offered by competent medical professionals, all of whom disagreed with Dr. Schmidt.[28]

The same can be said about what course of treatment was appropriate for Kosilek. Dr. Schmidt testified that Kosilek had "made an excellent adaptation" on her current treatment regimen and that surgery would not "confer any additional functional capability." Surgery was not, according to Dr. Schmidt, medically necessary for Kosilek. To minimize the risk of future harm to

---

[27] The majority mentions that none of the experts who opined that Kosilek completed a real-life experience considered that she might be housed in a female facility post-surgery. This is hardly surprising as this is a theory of my colleagues' own making. The DOC never made any argument that a potential post-surgery housing change rendered Kosilek unable to complete the real-life experience, nor did any provider opine that it was even a consideration.

[28] The Seventh Version of the Standards of Care came out in 2011. Notably it contains a new section devoted to scenarios where persons with gender identity disorder are living in institutional environments such as prisons or long-term care facilities. Standards of Care, Version 7, at 67. It provides that those individuals' health care "should mirror that which would be available to them if they were living in a non-institutional setting" and that "[a]ll elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions." Id.

Kosilek, Dr. Schmidt thought employing psychotherapy and medication to reduce her dysphoria and, if needed, placing Kosilek in a medical facility would be effective. A majority of the testifying medical providers said otherwise though. When asked what they thought about Dr. Schmidt's suggested regimen, Drs. Kapila, Kaufman, Appelbaum, and Forstein all thought it unreasonable.[29] The common thinking was that Dr. Schmidt's approach was not likely to effectively reduce Kosilek's risk of self harm, given that the source of her dysphoria was her male genitalia.

In the Eighth Amendment context, the adequacy of medical care is "measured against 'prudent professional standards.'" Nunes v. Mass. Dept. of Corr., 766 F.3d 136, 142 (1st Cir. 2014) (quoting DeCologero, 821 F.2d at 43). The district court here concluded that Dr. Schmidt was not a prudent professional. Given the above, I am not convinced that this determination was clearly erroneous. Dr. Schmidt's significant disagreement with widely accepted guidelines and the sharp contrast between his and the other well-credentialed providers' opinions, offer strong support for the court's finding.

---

[29] Court-appointed expert, Dr. Stephen Levine, ultimately testified that from a purely medical perspective (absent considerations relative to the prison environment), a prudent professional would not deny Kosilek sex reassignment surgery. However, Dr. Levine initially opined that Dr. Schmidt's view was reasonable (if not popular), a discrepancy that apparently arose from Dr. Levine disregarding the district court's order to treat Kosilek as a patient in free society. Considering this incongruity, I do not list Dr. Levine as one of Dr. Schmidt's critics.

## B. Adequacy of the DOC's Treatment

In light of the court's determination as to Dr. Schmidt's prudence, the question remains whether the evidence supported its conclusion that the DOC's treatment was not medically adequate. The majority's consideration of this issue begins with a faulty premise. It states that the "district court held that psychotherapy and antidepressants alone would not adequately treat Koslilek's GID," a finding the majority calls an incorrect characterization of the issues, and a minimization of the DOC's proffered treatment plan. It is the majority who is wrong.

The district court was of course well aware that the DOC was suggesting a more comprehensive treatment plan beyond therapy and medication. Nonetheless, as it repeatedly explained, it found that <u>all</u> treatment other than sex reassignment surgery was inadequate for Kosilek. <u>See</u>, <u>e.g.</u>, <u>Kosilek</u>, 889 F. Supp. 2d at 202, 233, 236, 238, 240. This included the DOC's past treatment, as well as its intended treatment going forward. In other words, the court did not minimize the DOC's regimen. Based on the testimony and evidence presented, it simply found the regimen did not, and would not going forward, adequately treat Kosilek's gender identity disorder. This finding was well within the court's purview to make. The fact that the DOC fashioned some treatment, in the form of hormone therapy, electrolysis, and access to feminine items does not insulate it from liability. In <u>De'Lonta</u> v.

Johnson, the Fourth Circuit Court of Appeals found that an inmate, who sought sex reassignment surgery after her gender identity disorder failed to resolve despite receiving hormones, stated a plausible deliberate indifference claim. 708 F.3d at 522, 525. The court concluded that, though the Virginia Department of Corrections had provided the inmate with hormone therapy and psychological counseling consistent with the Standards of Care, "it does not follow that they have necessarily provided her with constitutionally adequate treatment." Id. at 522, 526 (emphasis in original).

The majority nonetheless would have us believe the care provided by the DOC can withstand constitutional scrutiny. It endeavors to convince by giving little weight to the attested to shortcomings in Kosilek's treatment plan, and instead focusing heavily on the improvement Kosilek has made since being provided hormones, electrolysis, feminine garb and gear, and mental health treatment. This is not in dispute; Kosilek has indeed progressed. However, despite the short shrift the majority pays it, there was ample evidence supporting the district court's conclusion that this improvement was not sufficient to ease Kosilek's suffering to a point where she was no longer facing a life-threatening risk of harm.

Though the DOC has been treating Kosilek for many years, the district court found that she "continues to suffer intense

mental anguish." Kosilek, 889 F. Supp. 2d at 202. The court chronicled the evidence: Kosilek's own testimony about her continued distress,[30] the Fenway Center report indicating Kosilek's ongoing angst over her male genitalia and the high likelihood of another suicide attempt, and the along-the-same-lines testimony of Kosilek's treating psychologist, Mark Burrowes. See id. at 226. There was also Dr. Kaufman's testimony that, even with the treatment the DOC provided, Kosilek still suffered from clinically significant distress and severe dysphoria, a fact she found "quite notable." Dr. Brown testified similarly, explaining that Kosilek's treatment to date, including the hormones, had not obviated her need for surgery. Further, there was evidence that Kosilek's improvement was tangled up in her continuing hope that sex reassignment surgery would be provided. Dr. Brown testified: "And without that hope, the [DOC's] treatments are -- I wouldn't say for naught, but they are not going to continue her level of improvement where she is now."

Thus, even with Kosilek's documented improvement, Drs. Brown, Kaufman, Forstein, Kapila, and Appelbaum all testified unequivocally that sex reassignment surgery was medically necessary and the only appropriate treatment for Kosilek. They further

[30] The court found Kosilek testified credibly that although hormone treatments had helped, she was distressed by her male genitalia and believed that she needed surgery. Antidepressants and psychotherapy, according to Kosilek, would not alter the fact that she did not want to continue living with her male genitalia.

agreed that there was a serious risk of harm, most likely suicide, should Kosilek not receive the surgery, which was a concern the Fenway doctors voiced as early as 2005. As the majority says, this potentiality matters because the Eighth Amendment's protections extend beyond present suffering to future harm. See Helling v. McKinney, 509 U.S. 25, 33-34 (1993); Leavitt, 645 F.3d at 501.

The DOC's assertion that this future risk could be curbed with medication and psychotherapy cannot carry the day. As the district court found, treating the underlying disorder and its symptoms are two very different things, a distinction also drawn by the Seventh Circuit. See Fields v. Smith, 653 F.3d 550 (7th Cir. 2011). In Fields, the court found a Wisconsin statute that prohibited the state's correctional department from providing transgender inmates with hormones and sex reassignment surgery unconstitutional. Id. at 552-53, 559. The court, discussing how some patients require hormone therapy, found the department of corrections had not effectively rebutted the evidence that an offering of medication and psychotherapy would "do nothing to treat the underlying disorder." Id. at 556. In the instant matter, Drs. Appelbaum and Kapila testified that the preferred approach is to treat the underlying problem -- Kosilek's gender identity disorder -- as opposed to the symptoms it might produce. As chronicled above, the consensus was that the only way to adequately treat that problem was with sex reassignment surgery.

-94-

Lest we forget, the procedural posture of this case bears another mention. The DOC is challenging the district court's grant of injunctive relief following a bench trial, meaning that due regard is paid to the judge's factual findings and credibility determinations. See Monahan, 625 F.3d at 46. When the evidence yields competing inferences or two permissible views, we cannot second guess, "even if, had we been sitting as triers of the facts, we might have arrived at a different set of judgments." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 67 (1st Cir. 2009). Here the judge concluded that the DOC's present treatment regimen, with the added medication and therapy to cushion the post-surgery-denial fallout, would not reduce Kosilek's suffering to the point where she did not have a major medical need. Rather, sex reassignment surgery was the only adequate treatment for Kosilek's life-threatening disorder. As detailed above, these findings were supported by the un-objected to testimony of multiple eminently qualified doctors, by widely accepted, published standards, and by the testimony of Kosilek herself. The factfinder found this evidence convincing; he found the DOC's evidentiary offering less so. It is not for us to re-weigh the evidence and second-guess this determination, but that is exactly what the majority does.

What's more, by upholding the adequacy of the DOC's course of treatment, the majority in essence creates a de facto ban on sex reassignment surgery for inmates in this circuit. Its

attempt to repudiate this notion is not compelling. For instance, the fact that the DOC has "disclaimed any attempt to create a blanket policy regarding SRS" is a non-starter. The issue is not whether correctional departments will voluntarily provide the surgery, it is whether the precedent set by this court today will preclude inmates from ever being able to mount a successful Eighth Amendment claim for sex reassignment surgery in the courts. Equally unconvincing is the majority's assertion that the "unique circumstances" presented by Kosilek's case will prevent any de facto ban. The first so-called anomaly cited by the majority -- the divergence of opinion as to Kosilek's need for surgery -- only resulted from the DOC disregarding the advice of Kosilek's treating doctors and bringing in a predictable opponent to sex reassignment surgery. It is no stretch to imagine another department of corrections stealing a page from this play book, i.e., just bring in someone akin to Osborne. It is hardly a matchless scenario. The same goes for Kosilek's criminal history and post-surgical housing options, which the majority also points to. Rare will be the prisoner who does not pose some type of security concern, or harbor some potential for causing climate unrest. So the question remains, if Kosilek -- who was time and again diagnosed as suffering from severe gender identity disorder, and who was uniformly thought by qualified medical professionals to require

surgery -- is not an appropriate candidate for surgery, what inmate is?

In sum, the majority's conclusion that the district court wrongly found that Kosilek satisfied the objective component of the Eighth Amendment inquiry is, in my opinion, flatly incorrect. I am no more convinced by the majority's examination of the subjective component.

### IV. Eighth Amendment: Subjective Prong

A satisfied subjective prong means that prison officials had "a sufficiently culpable state of mind" in that they showed deliberate indifference to an inmate's health and safety. <u>Farmer</u>, 511 U.S. at 834; <u>Leavitt</u>, 645 F.3d at 497. The officials were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and they drew that inference. <u>Ruiz-Rosa</u> v. <u>Rullán</u>, 485 F.3d 150, 156 (1st Cir. 2007). The majority posits that the DOC, because it was faced with conflicting medical opinions about what treatment was appropriate for Kosilek, and because it proffered reasonable security concerns, was not deliberately indifferent to Kosilek's risk for serious harm. Both theories fail to convince.

## A. Conflicting Medical Opinions

The idea that incompatible medical opinions serve to insulate the DOC from a deliberate indifference finding is a concept not advanced by the DOC, which rests on several faulty propositions and has very problematic implications.

The majority concedes that the DOC never made this particular argument, but charitably claims it is not waived because "[t]he DOC's contention that the district court erred in deeming SRS medically necessary and in rejecting Dr. Schmidt's approach as imprudent necessarily entails the DOC's subjective belief that SRS was unnecessary."[31] This is a stretch. An argument advanced on appeal years after surgery was denied is not the equivalent of the DOC's subjective belief that sex reassignment surgery was unnecessary when it denied it. Moreover, the mere existence of contradictory medical opinions does not necessarily mean that the DOC did not deny Kosilek surgery for purely pretextual reasons. It is certainly conceivable that a correctional department could seize on an opinion from a medical provider, whether or not it found it compelling, as a means to justify denying treatment.

---

[31] When the DOC first informed the district court that it would not be providing Kosilek with surgery (back in June 2005 under Dennehy's watch), Dr. Schmidt had not even evaluated Kosilek let alone communicated his findings. At the time, the DOC was only armed with the report of Cynthia Osborne who had not met with Kosilek but rather had simply peer reviewed the Fenway Report.

Another even more serious flaw in the majority's theory is that it is contradicted by the evidence. Commissioner Dennehy testified multiple times, and submitted a report to the same effect, that it was security concerns that motivated her decision to deny Kosilek surgery. During Dennehy's first round of testimony, when she was still claiming ignorance about whether UMass (the DOC's contracted health-services provider) was recommending surgery, she testified that based "strictly [on] safety and security concerns" she would still veto the surgery even if UMass told her that it was medically necessary. Then, once UMass's position that surgery was medically necessary became pellucid to Dennehy, she submitted a report to the court indicating that she was standing firm in her decision to deny surgery based on "alarming and substantial" safety and security concerns. Her final time on the stand, Dennehy testified that the only thing, in her view, preventing surgery for Kosilek was safety and security concerns; absent such concerns, Dennehy would have no reason to interfere with any medical order for treatment.

The evidence with regard to Commissioner Clarke's stance on the issue was similar. In his report to the court, Clarke disclaimed any ability to render an opinion on the validity of the medical opinions expressed at trial, and went on to explain his view that "the safety and security concerns presented by the prospect of undertaking sex reassignment surgery for Michelle

Kosilek are insurmountable." Clarke then hammered home his security concerns on the stand. Therefore, even though there was contradictory opinions on whether surgery was medically necessary for Kosilek, both Dennehy's and Clarke's decision to deny the procedure was, as they put it, based solely on security concerns.

The majority's presumption that the existence of varying medical opinions should insulate the DOC is not only an unpreserved, unsupported argument but it has very troubling implications. It gives correctional departments serious leeway with the Eighth Amendment. If they do not want to provide a prisoner with care recommended by one or more than one medical provider, they need only find a doctor with a differing mind set (typically not a difficult task). It is no stretch to think that might be what happened here. The DOC had the treatment recommendation of Drs. Kaufman and Kapila, a local psychiatrist and psychologist who had evaluated Kosilek. The doctors themselves were recommended by the DOC's own medical provider, UMass. Yet the DOC took the unusual step of having the Fenway doctors' recommendation peer reviewed by Cynthia Osborne, an out-of-state social worker with a known opinion about sex reassignment surgery. It seems highly unlikely that the DOC was simply looking for a more complete picture of Kosilek's treatment options, and that Osborne's predictable opposition to Kosilek being provided with surgery was a non-factor. The DOC knew that Osborne was working with the

Virginia and Wisconsin departments of corrections to help defend lawsuits filed by transgender prisoners, and internal DOC meeting minutes noted that Osborne "may do more objective evaluations" and was "[m]ore sympathetic to DOC position."  Predictably, Osborne was one-hundred percent sympathetic.

## B. Security Concerns

There is no dispute that "security considerations . . . matter at prisons," leaving "ample room for professional judgment." Battista v. Clarke, 645 F.3d 449, 453, 454 (1st Cir. 2011).  "Any professional judgment that decides an issue involving conditions of confinement must embrace security and administration and not merely medical judgments."  Id. at 455 (quoting Cameron v. Tomes, 900 F.2d 14, 20 (1st Cir. 1993) (emphasis in original)).  But it is also true that at some point a defendant forfeits the advantage of deference, for instance following a "pattern of delays, new objections substituted for old ones, misinformation and other negatives."[32]  Id.  The district court determined that the DOC had done just this, causing undue delay in Kosilek's treatment regimen,

---

[32]  The pattern in Battista -- a case in which a transgender inmate sued the Massachusetts DOC for failing to provide doctor-recommended hormones -- included an initial failure to take the inmate's diagnosis and hormone request seriously, the years it took for a solid security justification to be made, and the DOC's claim that withholding hormones or placing the inmate in severely constraining protective custody were the only two options.  In other words, there are some marked similarities between that case and this one.  That is, apart from their outcomes. In Battista, this court affirmed the district court's deliberate indifference determination.

manufacturing security concerns, and orchestrating a half-hearted security review.  The record amply supported these conclusions, yet the majority too easily discounts them, especially given the deferential look this issue warrants.  <u>See</u>, <u>e.g.</u>, <u>Torraco</u>, 923 F.2d at 234 (explaining that deliberate indifference is usually a jury question); <u>Monahan</u>, 625 F.3d at 46 (providing that due regard is given to credibility calls); <u>Fed. Refinance Co.</u>, 352 F.3d at 27-28 (noting that a clear error look makes sense when there are questions of motive and intent).

Of course, it has been many years since medical providers began considering the propriety of surgery for Kosilek.  Back during <u>Kosilek I</u>, Dr. Forstein recommended that Kosilek be allowed to consult with a surgeon who specialized in sex reassignment surgery.  Then in 2003, Dr. Seil said Kosilek should be allowed to meet with a specialist after a year on hormones.  But right when she started as commissioner, Dennehy made a curious move.  She reassessed the care being provided to all inmates suffering from gender identity disorder, despite the DOC's contract with UMass placing that medical care squarely in UMass's purview.  Then once the Fenway doctors opined in 2005 that Kosilek should be allowed to have surgery, the DOC frittered away time claiming not to understand that UMass recommended surgery for Kosilek.  The majority does not quibble with the court's finding that the DOC prevaricated in this respect because it "does not undercut the

consistency with which they identified safety and security concerns." This misses the point. To establish a subjective intent, "it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'" Battista, 645 F.3d at 453 (quoting DesRosiers, 949 F.2d at 19); see also Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005) (A "deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."). That is precisely what the district court found happened here, and the evidentiary support for this determination is in the record.

The same goes for the court's conclusion that the DOC's security reviews were rushed and results-driven. Dennehy told a news outlet that the DOC would deny Kosilek's request for surgery despite only having "generalized discussions" and phone calls with the relevant players; she had not yet received written reports or convened a formal security meeting. When the DOC did meet, there was just a week left before its court-ordered security report was due -- a report that was then penned predominantly by trial counsel and reviewed by Dennehy only a day or two before its filing. Once trial was underway, the hurriedness continued. A mere nine days before expert disclosures were due, Dennehy contacted the director of the Federal Bureau of Prisons looking for a security expert. And the experts the DOC ultimately did present at trial seemed ill

-103-

prepared, failing to take into account important details about Kosilek's medical and disciplinary history.

For the district court, another reason not to esteem the DOC's proffered security concerns was the fact that they were "largely false" and "greatly exaggerated." This finding is not clearly erroneous. Yet the majority easily dismisses it, in part by limiting its focus to what it presumably perceives as the DOC's more valid security concerns -- where to house Kosilek post-operatively and the deterrence of false suicide threats by inmates. The majority is conveniently forgetting the throw-it-up-and-see-what-sticks approach taken by the DOC below. It was this approach, in part, that led the court to question whether the DOC could be trusted to give an accurate picture of security concerns consequent to surgery.

For instance, the DOC repeatedly claimed that transporting Kosilek to surgery out of state would pose an insurmountable security risk. It is hardly surprising the district court thought this was an embellished concern. Kosilek had been transported to multiple doctor's appointments without issue, and it is illogical to think Kosilek would attempt to flee en route to the surgery she has dedicated decades of her life to obtaining. Also eminently unlikely is that during the transport home from highly invasive surgery, a sixty-five-year-old, recovering Kosilek would be able to escape the grasp of DOC personnel. Even Clarke thought

it near certain that Kosilek could safely be transported to and from surgery.

With regard to housing Kosilek in a female prison, the DOC painted Kosilek as a highly-polarizing escape risk who could not possibly safely reside in MCI-Framingham's general population. It pointed to the comparatively weaker perimeter of MCI-Framingham, alleging that Kosilek's superior male strength and life sentence made her a flight risk. One can easily see why the district court was not buying this. Kosilek was advanced in age, physically slight, had taken female hormones for years, and had an excellent disciplinary record. And MCI-Framingham successfully housed approximately forty life offenders. The court also had reason to be skeptical of the DOC's adamant contention that Kosilek would cause inmate climate issues at MCI-Framingham due to the fact that she murdered her wife. Undoubtedly inmates find other inmates offensive for a plethora of reasons, such as, race, religion, gang affiliation, sexual orientation, or the crime committed. Prisons deal with these situations on a routine basis and the evidence established that MCI-Framingham had procedures in place to do just that.

The DOC even admitted at oral argument that had a post-operative, transgender person out in free society committed murder, the DOC would have to figure out where to house that person. The DOC; however, did not think this a particularly important point,

protesting that Kosilek presents unique concerns that separate her from this hypothetical inmate. I am unmoved. The fact that Kosilek's crime was one of violence against a woman could equally apply to another potential inmate. And the fact that Kosilek gained notoriety by litigating against the DOC all these years -- in other words, successfully pursuing her constitutional right to adequate medical care -- hardly seems a compelling consideration.

For the district court, also blunting the DOC's fervent cries of overwhelming security concerns were the alternatives to placing Kosilek in the general population of a Massachusetts prison. There was the option of transferring Kosilek to an out-of-state prison (though this scenario appears to have been left largely unexplored by the DOC). In fact, the evidence established that Clarke's former employer, the Washington Department of Corrections, housed a post-operative female transgender inmate, also serving a life sentence for murdering a female relative, without security or climate issues. The inmate's housing was so unremarkable that Clarke was not even aware of it during his tenure in Washington. Further, there was evidence that Kosilek's safety could be ensured by placing her in a segregated housing unit.

The DOC's past conduct was also relevant to the district court's credibility assessment. In connection with Kosilek I, then Commissioner Michael Maloney hammered the serious security concerns surrounding Kosilek remaining at MCI-Norfolk while receiving

hormones, theorizing that an inmate living as a female (with female attributes) among sex offenders would create a risk of violence. However, once the DOC actually stopped to conduct a security review, it determined there were no current security concerns with Kosilek being provided estrogen therapy. Indeed no security issues ever arose. Kosilek has been safely housed at MCI-Norfolk for many years presenting herself as female. The DOC's reversal on this issue calls into question its stance before this court about the non-feasibility of housing a post-surgical Kosilek at MCI-Norfolk.

The DOC also expressed concern that providing Kosilek with surgery would encourage inmates to utilize suicide threats to receive a desired benefit, and the majority deems this concern reasonable. I am not convinced, and neither was the district court. Not only is there absolutely no evidence that Kosilek is trying to game the system, but the DOC, as it emphasized at trial, employs mental health professionals and has policies in place to deal with suicidality. Presumably, these tools can be used by the DOC to assess whether an inmate's particular suicide threat is manufactured or real, and it can be dealt with accordingly. That the DOC does not want to be inundated with a hypothetical influx of false suicide threats hardly seems a valid reason to deny a prisoner care deemed medically necessary.

For the district court, the public and political disapproval of Kosilek's surgical pursuit was another factor. It

did not believe Dennehy's and Clarke's claims that the avoidance of controversy played no role in the DOC's decision to deny surgery. The majority concedes that it must give deference to the court's finding that Dennehy's motivations were colored by public pressure and so, instead, the majority hypes up the role of Commissioner Clarke by characterizing him as the ultimate decision maker. I see a few flaws with the majority's reasoning.

For one, the majority says the district court improperly imputed Dennehy's motivations to Clarke, thus ignoring the injunctive-relief requirement that it take into account the DOC's then present-day stance.[33] See Farmer, 511 U.S. at 845 (quoting Helling, 509 U.S. at 36) (The court considers deliberate indifference "'in light of the prison authorities' current attitudes and conduct,' . . . their attitudes and conduct at the time suit is brought and persisting thereafter."). The majority has it wrong. The court took testimony from Clarke, reviewed his written report, and spoke extensively in its decision about why it was not convinced that Clarke denied Kosilek surgery based on

_____

[33] While a defendant's attitudes and conduct at the time a decision is rendered are relevant, what motivates the DOC today is not. This fact may be less than clear given the majority's reference to the DOC's present stance ("proof that the DOC remains motivated by pretextual or improper concerns") and the fact that Dennehy is now seven years removed from the decision-making process. To be clear, we are reviewing the district court's decision that the DOC, through Dennehy and Clarke, denied Kosilek surgery based on pretextual reasons. Indeed it would be an amazing feat of prescience for the district court to anticipate what the DOC's viewpoint would be two years after penning its decision.

legitimate penological concerns. Of note, it was Kosilek who sought to have Clarke inform the court of his position, and the DOC, which stipulated at trial that Dennehy was the operative decision maker, actually objected to Clarke even testifying as he was simply "maintain[ing] the position set forth by the DOC through former Commissioner Dennehy."

Furthermore, though the majority defers to the court's take on Dennehy, it refuses to do so for Clarke, claiming that "Clarke was never found by the court to be non-credible." This is not entirely accurate. Clearly the import of the court's conclusion that Clarke's articulated security concerns were either false or exaggerated as a pretext to deny surgery means that the court did not think Clarke a completely credible witness. <u>See</u> <u>Kosilek</u>, 889 F. Supp. 2d at 241 ("[T]he purported security considerations that Dennehy and Clarke claim motivated their decisions to deny Kosilek sex reassignment surgery are largely false and any possible genuine concerns have been greatly exaggerated to provide a pretext for denying the prescribed treatment.") In fact, the court specifically found certain claims made by Clarke not to be credible. <u>See</u> <u>id.</u> at 244 (finding that "neither Dennehy nor Clarke has provided a credible explanation for their purported belief that if Kosilek's genitalia are altered the risk to him and others at MCI Norfolk will be materially magnified" and "[t]he claims of Dennehy and Clarke that they have denied sex

reassignment surgery for Kosilek in part because MCI Framingham is not sufficiently secure to prevent an escape by Kosilek, who has never attempted to flee, are not credible.")  Therefore, as it did with Dennehy, the majority should be giving due regard to the court's conclusion that Clarke was not believable.

The majority also misses the mark with its contention that the "only evidence" tending to show Clarke may have considered public and political criticism were the two letters from the unhappy Massachusetts legislators.  This is not the whole picture.  In addition to the letters, what convinced the court that Clarke was improperly motivated was his advancing inflated security concerns following a hasty review, suggesting that he did not operate with an open mind.  Having already detailed the evidence supporting the court's distrust of the DOC's proffered security concerns, I will not rehash.

As for the thoroughness of Clarke's review, the court criticized Clarke for not consulting with Luis Spencer, who was Superintendent of MCI-Norfolk at the time, and for not reviewing the DOC's security-expert trial testimony, prior to deciding whether to deny surgery.  The DOC counters that Clarke, pursuant to the court's order, was not required to do either of those things.  It is both conceivable that Clarke's review was too cursory, or that he felt constrained by the court's order, though the fact that Clarke did not know significant details such as Kosilek's age and

excellent disciplinary record favors the former possibility. Either way, both views are permissible, which means that the district court's choice of one of them cannot be clearly erroneous. See Monahan, 625 F.3d at 46. Nor is it appropriate for us to second-guess the court's tenable perception of Clarke's motivations, as deference extends to "inferences drawn from the underlying facts, and if the trial court's reading of the record [with respect to an actor's motivation] is plausible, appellate review is at an end." Janeiro, 457 F.3d at 138-39 (internal quotation marks omitted) (alteration in original).

Ultimately, there was adequate evidentiary support for the court's determination that the DOC was deliberately indifferent. The court did not obviously err in concluding the DOC delayed implementing medical treatment recommended by its own providers, sought out a more favorable medical opinion, engaged in a hasty, result-driven security review, offered a host of poorly thought out security concerns, and then denied surgery based not on any legitimate penological concerns but on a fear of controversy. Whether I, or any of my colleagues, would have drawn these same conclusions had we been presiding over this trial is irrelevant; our review is circumscribed. It is enough that the district court had a reasonable basis for its judgment. The district court's determination that the Eighth Amendment's subjective prong was satisfied should stand.

## V. Conclusion

I am confident that I would not need to pen this dissent, over twenty years after Kosilek's quest for constitutionally adequate medical care began, were she not seeking a treatment that many see as strange or immoral. Prejudice and fear of the unfamiliar have undoubtedly played a role in this matter's protraction. Whether today's decision brings this case to a close, I cannot say. But I am confident that this decision will not stand the test of time, ultimately being shelved with the likes of <u>Plessy</u> v. <u>Ferguson</u>, 163 U.S. 537 (1896), deeming constitutional state laws requiring racial segregation, and <u>Korematsu</u> v. <u>United States</u>, 323 U.S. 214 (1944), finding constitutional the internment of Japanese-Americans in camps during World War II. I only hope that day is not far in the future, for the precedent the majority creates is damaging. It paves the way for unprincipled grants of en banc relief, decimates the deference paid to a trial judge following a bench trial, aggrieves an already marginalized community, and enables correctional systems to further postpone their adjustment to the crumbling gender binary.

I respectfully dissent.

**KAYATTA, <u>Circuit Judge</u>, dissenting.** Reading the majority's lengthy and oft-revisited discussion of the applicable standard of review, one would think that this case posed issues of law or application of law to fact. This is plainly not so.

There is not a comma, much less a word, of the applicable law that the district court did not expressly and correctly explain and apply. All the parties and all the judges in this case, including the trial judge, agree on the controlling principles of law, long ago established by the Supreme Court. <u>See</u> <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 104 (1976); <u>Farmer</u> v. <u>Brennan</u>, 511 U.S. 825, 837 (1994); <u>see also</u> <u>United States</u> v. <u>DeCologero</u>, 821 F.2d 39, 43 (1st Cir. 1987). Under that law, a prison must supply medical care to its prisoners "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." <u>DeCologero</u>, 821 F.2d at 43. The failure to provide such care, moreover, does not constitute an Eighth Amendment violation unless it rises to the level of "deliberate indifference" to a "serious medical need." "Deliberate indifference" means that the prison official "knows of and disregards an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837. A "serious medical need" is defined as, among other things, "one that has been diagnosed by a physician as mandating treatment." <u>Gaudreault</u> v. <u>Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990).

Our decision in this case therefore necessarily turns on the facts themselves.  And we begin our review knowing that Kosilek does indeed have a serious medical need, and the prison's own doctors, as well as the specialists retained by those doctors, informed DOC that treatment of Kosilek's medical condition in accordance with prudent professional standards requires sex reassignment surgery (SRS).[34]  That leaves only two factual questions:  (1) Are the DOC's doctors correct that SRS is the only treatment for Kosilek's condition that is commensurate with modern medical science as practiced by prudent professionals;[35] and, if so, (2) Did prison officials nevertheless deny that treatment not because they disbelieved their own doctors, and not because of prison security considerations, but rather simply because they feared public ridicule.  If the answer to each of these two questions is "yes," Kosilek should win.  Otherwise, she loses.

Were I the trial judge charged with answering these two factual questions based solely on the written record, I would likely find against Kosilek on the first question for the reasons stated by the trial court's appointed independent expert, Dr. Levine.  In a nutshell, Dr. Levine, who participated in drafting

---

[34]  None of these witnesses face challenge on the grounds that their opinions are outside the bounds of accepted science.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90 (1993).

[35]  In the majority's words, "whether SRS is a medically necessary component of Kosilek's care, such that any course of treatment not including surgery is constitutionally inadequate." Slip Op. at 46.

the Standards of Care, provided carefully nuanced and persuasive testimony that medical science has not reached a wide, scientifically driven consensus mandating SRS as the only acceptable treatment for an incarcerated individual with gender dysphoria. But I am not the trial judge in this case. Nor are my colleagues. And that is the rub.

The experienced jurist who was the trial judge in this case, and who actually sat and listened to the live testimony, found as a matter of fact that:

(1) Commensurate with modern medical science, no prudent professional would recommend any treatment for Kosilek other than SRS; and

(2) Prison officials nevertheless denied the treatment not because they rejected the accuracy of the medical advice tendered by their own doctors, and not because of security issues, but rather because they feared public ridicule. Their reasons for denying the necessary treatment were thus in bad faith.

The majority never explains why these two findings are not pure findings of fact, and are not therefore subject solely to review for clear error. Nor can it. After all, we are talking about, first, what the medical--not legal--standard of care is for a particular affliction, and second, whether Dennehy and Clarke were truthful in describing their security objections, such as their claim that they feared that Kosilek, after trying to get this

-115-

surgery for twenty years, would escape on the way to the operating room or, fresh from the surgeon's knife, overpower her guards and run away. Let me be plain on this point: Until today, there was absolutely no precedent (and the majority cites none) for reviewing such quintessentially factual findings under anything other than the clear error test.

As Judge Thompson carefully explains, there is a considerable amount of evidence that directly supports the trial court's findings on these two points, depending on which witnesses one believes. I write separately only to stress that even if one agrees with the majority that the district court got the fact-finding wrong, we should defer unless the result is clearly erroneous. Of course, deferring to the trial judge's fact-finding happens to produce a result in this case that some of us find surprising, and much of the public likely finds shocking. Scientific knowledge advances quickly and without regard to settled norms and arrangements. It sometimes draws in its wake a reluctant community, unnerved by notions that challenge our views of who we are and how we fit in the universe. The notion that hard-wired aspects of gender may not unerringly and inexorably correspond to physical anatomy is especially unnerving for many.

The solution, I think, is to trust our trial judges to resolve these factual issues when the evidence supports a finding either way. Some will get it wrong; most will get it right. The

arc of decision-making, over time, will bend towards the latter. For each instance of error in fact-finding, such as possibly this case itself, $25,000 or so may be lost. But doctors and lawyers will refine their presentations and other trial judges will make their own findings, not bound in any way by the fact-finding in this case.

Instead, by deciding the facts in this case as an appellate court essentially finding law, the majority ends any search for the truth through continued examination of the medical evidence by the trial courts. It locks in an answer that binds all trial courts in the circuit: no prison may be required to provide SRS to a prisoner who suffers from gender dysphoria as long as a prison official calls up Ms. Osborne or Dr. Schmidt.[36] Acknowledging that the majority may well be correct on the facts, I nevertheless decline the invitation to join the majority in embracing the authority to decide the facts. I suspect that our court will devote some effort in the coming years to distinguishing this case, and eventually reducing it to a one-off reserved only for transgender prisoners.

---

[36] No prisoner is likely to have a more favorable record than Kosilek.